EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Wanda Ivette Maldonado<br><br>Peticionaria<br><br>v.<br><br>Elwood Cruz Dávila<br><br>Recurrido<br><br>Gladys Arce<br><br>Recurrida | Certiorari<br><br>2004 TSPR 1<br><br>160 DPR \_\_\_\_ |

Número del Caso: CC-2000-154


Fecha: 8 de enero de 2004


Tribunal de Circuito de Apelaciones:
                    Circuito Regional VII


Juez Ponente:
                    Hon. Frank Rodríguez García

Abogada de la Parte Peticionaria:
                    Lcda. Sarah Torres Peralta

Abogadas del Recurrido:
                    Lcda. Pilar B. Pérez Rojas
                    Lcda. Zoila Espinosa Vaquer

Abogada de la Parte Recurrida:
                    Lcda. Isabel L. Rodríguez Bonet


Materia: Divorcio


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Ivette Maldonado

    Peticionaria

      v.

                        CC-2000-154     CERTIORARI

Elwood Cruz Dávila

    Apelado

Gladys Arce

    Apelada

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 8 de enero de 2004

El vínculo matrimonial que unía a la señora Wanda Ivette Maldonado, aquí peticionaria, con el señor Elwood Cruz Dávila quedó disuelto mediante sentencia de 6 de marzo de 1992, dictada por el Tribunal de Primera Instancia, Sala Superior de Carolina, en un procedimiento de divorcio por consentimiento mutuo. Conforme a lo estipulado por los allí peticionarios, la custodia de la menor procreada durante el matrimonio le fue adjudicada a su madre, la señora Wanda Ivette Maldonado, mientras que la patria potestad sería compartida por ambos progenitores. También se estipuló que el señor Cruz Dávila pagaría, en concepto de pensión alimentaria, la suma de ciento sesenta dólares

mensuales. Una vez la menor comenzó a asistir a la escuela, el señor Cruz Dávila se encargó, además, del pago de la matrícula escolar --ascendente a cuatrocientos dólares anuales-- y de las correspondientes mensualidades de la misma, las cuales ascendían a doscientos dólares mensuales. Cruz Dávila también pagó por un plan médico para la menor.

Así las cosas, el 7 de mayo de 1996, la señora Maldonado, en representación de su hija menor, presentó ante el foro de instancia un escrito titulado "Moción Solicitando Modificación y Aumento de Pensión Alimentaria". En el referido escrito la señora Maldonado solicitó que "se decret[ara] una modificación de la pensión alimentaria vigente de $360.00 por mes, a una suma no menor de ochocientos dólares mensuales, más el plan médico." Incluyó, además, como parte demandada a la señora Gladys Arce Rosado, actual esposa del señor Cruz Dávila, alegando que ésta era "parte realmente interesada en este procedimiento, por cuanto es persona con ingresos mensuales sustanciales provenientes de su empleo, con las aportaciones correspondientes a la manutención del hogar conyugal que tiene establecido con el padre."

El 19 de junio de 1996, la señora Arce Rosado presentó una moción de sentencia sumaria aduciendo que, previo a contraer matrimonio, ella y su esposo otorgaron capitulaciones matrimoniales, en virtud de las cuales manifestaron _expresamente_ su repudio a los principios de

la sociedad de gananciales y a las reglas que rigen dicha entidad jurídica, optando por acoger, también de manera expresa, el régimen de separación de bienes. Adujo que, si bien es correcto que, conforme lo dispuesto en el Artículo 1308 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3661, la responsabilidad de sostener los hijos de cualquiera de los cónyuges recae sobre la sociedad legal de bienes gananciales que surge a raíz del nuevo vínculo matrimonial, en su caso en particular no existía entre ella y su esposo tal sociedad, razón por la cual era evidente que no existía ninguna obligación de su parte de contribuir económicamente en el sostenimiento de la hija menor de su esposo.

La señora Maldonado, por su parte, se opuso a la moción de sentencia sumaria alegando que la escritura de capitulaciones a la que la señora Arce Rosado hacía referencia no era propiamente un instrumento público de capitulaciones, sino un contrato privado entre las partes donde se intentaba regular, no sólo aspectos relativos a la vida conyugal de la pareja, sino, además, lo referente a las relaciones consensuales que regirían antes y después del matrimonio. Adujo que el referido instrumento adolecía de nulidad por contener cláusulas que resultaban ser ambiguas y contrarias al orden público y que del propio texto de la escritura surgía la existencia de una comunidad de bienes entre los esposos Cruz-Arce. Finalmente, alegó que no debía desestimarse la acción en

contra de la señora Arce Rosado sin antes celebrar una vista evidenciaria a los fines de examinar si el matrimonio seguía "meticulosa y religiosamente" el régimen de separación de bienes pactado.

Luego de varios incidentes procesales, el 5 de marzo de 1997, la señora Maldonado y el señor Cruz Dávila suscribieron una estipulación sobre pensión alimentaria que fue aprobada por el foro de instancia mediante resolución emitida el 18 de febrero de 1998 y notificada el 8 de junio de 1998.[1] En dicha estipulación las partes acordaron que, efectivo el día primero de enero de 1997, el padre alimentante pagaría la suma de quinientos dólares mensuales en concepto de pensión alimentaria para su hija menor. El señor Cruz se comprometió, además, a pagar una suma de ochocientos dólares para cubrir retroactivamente la pensión acordada y otros ochocientos dólares por concepto de honorarios de abogado. También quedó estipulado que el padre cubriría los siguientes gastos de la menor: (i) la matrícula escolar de la niña; (ii) las mensualidades escolares; (iii) el costo de los libros y efectos escolares; (iv) las tutorías; y (v) el plan médico.[2]

---

[1] La señora Arce no fue parte en dicha negociación.

[2] El 7 de febrero de 2000 el señor Cruz Dávila presentó una moción solicitando vista con carácter urgente donde informó que la señora Maldonado pretendía matricular a la menor en el Colegio Saint John's en Condado, cuyos costos duplicaban las sumas que a ese momento sufragaba el
(Continúa . . .)

Transcurridos apenas cuatro meses desde que el foro de instancia aprobara la estipulación, la señora Maldonado sometió una <u>segunda</u> solicitud de aumento de pensión alimentaria, trayendo nuevamente al pleito a la señora Arce Rosado como parte indispensable. En esta ocasión la peticionaria solicitó una pensión de mil quinientos dólares mensuales, alegando que, "conforme la mejor información de la peticionaria, sujeta a verificación precisa", a la fecha en que se sometió la estipulación sobre alimentos acordada entre las partes, el padre alimentante contaba con el beneficio de ingresos sustancialmente más altos que los informados en su planilla de información personal y económica. Adujo, además, que a partir de los acuerdos alimentarios informados, los ingresos del padre alimentante, <u>y de su sociedad de gananciales</u>, habían aumentado sustancialmente, lo que a su vez también constituía un cambio significativo y sustancial que ameritaba modificación y aumento de la pensión alimentaria vigente.

Así las cosas, el 5 de agosto de 1998, la señora Arce Rosado presentó una moción de desestimación solicitando

---

alimentante, sin consultar previamente con el padre quien también ostenta la patria potestad de la menor. Mediante resolución a esos efectos el foro de instancia dictaminó que el cambio de escuela, sin autorización del padre con patria potestad, no conllevaría ningún cambio sustancial en la cuantía de la pensión alimentaria de la menor.

nuevamente que se le excluyera del pleito de alimentos.[3] El señor Cruz Dávila, por su parte, presentó un escrito donde alegó, entre otras cosas, que aún no había transcurrido el término establecido por ley para la revisión de la pensión alimentaria impuesta y que tampoco se alegaba la existencia de cambios sustanciales que ameritaran la modificación de la misma. Además, señaló que en la eventualidad de que el foro de instancia entendiera que los ingresos de la señora Arce Rosado debían ser considerados a los fines de establecer la pensión alimentaria de su hija menor, entonces, era imperativo que el señor Anthony Michael Doran Gelabert, casado con la señora Maldonado por capitulaciones matrimoniales, también fuera traído al pleito.[4]

El tribunal de instancia emitió una sentencia sumaria parcial desestimando la causa de acción en contra de la señora Arce Rosado "por [ésta] haber contraído matrimonio bajo el régimen de separación de bienes". Inconforme con tal determinación, la señora Maldonado acudió, vía recurso de apelación, ante el Tribunal de Apelaciones alegando, en síntesis, que incidió el foro primario al concluir que el matrimonio de los esposos Cruz-Arce se contrajo bajo el

---

[3] En esta ocasión la señora Arce discutió básicamente los mismos planteamientos esgrimidos en su moción de sentencia sumaria.

[4] Luego de realizada la referida alegación, el señor Anthony M. Doran voluntariamente solicitó intervenir en el caso.

régimen de separación de bienes basando su dictamen en una escritura de capitulaciones que adolecía de nulidad tanto en su forma como en su contenido. Sostuvo, además, que el referido foro incidió al desestimar sumariamente la acción en contra de la señora Arce pues, a su juicio, los hechos del presente caso demuestran la necesidad de celebrar una vista evidenciaria --con la señora Arce como parte indispensable-- a los fines de determinar si entre ésta y el señor Cruz Dávila surgió una sociedad legal de gananciales o, en la alternativa, cuantificar las aportaciones económicas que ésta realiza al hogar conyugal a los fines de imputarle la suma de dinero resultante al señor Cruz Dávila en concepto de ingreso bruto adicional.

Mediante resolución a esos efectos, el tribunal apelativo intermedio confirmó el dictamen recurrido. Razonó que los esposos Cruz-Arce habían repudiado expresamente el régimen legal de sociedad de gananciales y que habían escogido el de separación de bienes como el único régimen económico que existiría entre ellos. En tal virtud, el referido foro concluyó que "en el caso de autos no existe una sociedad legal de gananciales obligada al sostenimiento de la hija del señor Cruz, procreada en su anterior matrimonio." Refiriéndose específicamente a la alegación de nulidad de las capitulaciones, el foro apelativo intermedio concluyó que las mismas eran válidas y que habían sido otorgadas conforme a Derecho. En tal virtud, dispuso que no había necesidad alguna de celebrar

una vista evidenciaria para determinar el régimen económico imperante en el matrimonio Cruz-Arce y, mucho menos, para realizar una imputación de ingresos con relación al señor Cruz Dávila.

Inconforme, la señora Maldonado acudió --vía *certiorari*-- ante este Tribunal.[5] Alegó que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió al determinar la validez del contrato de capitulaciones aquí en controversia y al concluir que en el presente caso no era necesaria la celebración de una vista evidenciaria.

Expedimos el recurso.[6] Contando con las comparecencias de ambas partes, y estando en condición de resolver el mismo, procedemos a así hacerlo. Confirmamos; veamos por qué.

---

[5] El recurso fue presentado, además, vía apelación, pues, según se alegó, existe un conflicto entre la sentencia dictada en el presente caso por el Tribunal de Circuito de Apelaciones, Circuito Regional de Carolina-Fajardo, y una dictada por el Circuito Regional de Mayagüez-Aguadilla.

[6] El recurso fue expedido el 30 de marzo de 2000. Según surge de los autos, el 26 de abril de 2000 la señora Maldonado sometió un escrito titulado "Solicitud Complementaria sobre Modificación y Aumento de Pensión Alimentaria y Otros Extremos" informando que ya habían transcurrido más de tres años desde la fecha de efectividad de la pensión alimentaria vigente. En tal virtud, solicitó un aumento en la pensión alimentaria por una suma no menor de $1,750.00 mensuales. En vista de la expedición del presente caso, la peticionaria se abstuvo --esta vez-- de reclamar alimentos a la señora Arce, señalando que se reservaba los derechos que pudieran corresponderle a la resolución del presente caso.

I

El derecho a reclamar alimentos es parte esencial del principio natural de conservación que constituye piedra angular del derecho constitucional a la vida. <u>Martínez</u> v. <u>Rodríguez</u>, res. el 13 de agosto de 2003, 2003 T.S.P.R. 134; <u>Chévere</u> v. <u>Levis</u>, res. el 15 de marzo de 2000, 2000 T.S.P.R. 42. En tal virtud, hemos resuelto que los casos de alimentos, en específico los relativos a menores de edad, están revestidos del más alto interés público.[7] Dicho interés es uno de categoría suprema que se fundamenta, entre otras cosas, en principios universalmente reconocidos de solidaridad humana y en los derechos fundamentales del ser humano. <u>Martínez</u> v. <u>Rivera Hernández</u>, 116 D.P.R. 164, 168 (1986); véase, además: Raúl Serrano Geyls, <u>Derecho de Familia de Puerto Rico y Legislación Comparada</u>, San Juan, Ed. Programa de Educación Jurídica Continua Universidad Interamericana, 2002, Vol. II, pág. 1413.

---

[7] Véase, entre otros: <u>Argüello López</u> v. <u>Argüello García</u>, res. el 31 de agosto de 2001, 2001 T.S.P.R. 124; <u>Figueroa Robledo</u> v. <u>Rivera Rosa</u>, res. el 22 de octubre de 1999, 99 T.S.P.R. 159; <u>Galarza Rivera</u> v. <u>Mercado Pagán</u>, 139 D.P.R. 619 (1995); <u>Rodríguez Sanabria</u> v. <u>Soler Vargas</u>, 135 D.P.R. 779 (1994); <u>Rodríguez Rosado</u> v. <u>Zayas Martínez</u>, 133 D.P.R. 406 (1993); <u>Robles</u> v. <u>Otero de Ramos</u>, 127 D.P.R. 911 (1991); 120 D.P.R. 61 (1987); <u>López</u> v. <u>Rodríguez</u>, 121 D.P.R. 23 (1988); <u>Negrón Rivera y Bonilla Ex parte,</u> 120 D.P.R. 61 (1987); <u>Quiñones</u> v. <u>Jiménez Conde,</u> 117 D.P.R. 1 (1986); <u>Rodríguez Avilés</u> v. <u>Rodríguez Beruff,</u> 117 D.P.R. 616 (1986); <u>Martínez</u> v. <u>Rivera Hernández,</u> 116 D.P.R. 164 (1985); <u>Otero Fernández</u> v. <u>Alguacil,</u> 116 D.P.R. 733 (1985).

Refiriéndonos específicamente a esta obligación, en Martínez v. Rodríguez, ante, señalamos que la misma "surge de la relación paterno-filial que se origina en el momento en que la paternidad o maternidad quedan establecidos legalmente."[8] Se trata, pues, de un deber que "existe por un derecho natural a percibir alimentos que simplemente ha sido formalizado por el legislador convirtiéndola en derecho positivo y vigente y, por otro lado, creando en el ánimo del obligado el deber de proporcionarlos independientemente de su voluntad de cumplir." Pedro F. Silva-Ruiz, *Alimentos para menores de edad en Puerto Rico: las guías mandatorias basadas en criterios numéricos para la determinación y modificación de pensiones alimenticias*, 52 REV. COL. ABOG., abril-junio 1991, en la pág. 112.

Como vemos, la naturaleza jurídica de esta obligación la diferencia del resto de las obligaciones, pues se trata de un deber legal que existe entre el alimentista y el alimentante en virtud del vínculo parental personalísimo que los une, donde la prestación debida es vital para la persona del acreedor.[9] Ello explica que el Estado, como parte de su política pública, haya legislado ampliamente para velar por su cumplimiento. Chévere v. Levis, ante.

Una de las fuentes estatutarias de esta obligación la encontramos en el Artículo 153 del Código Civil, 31

---

[8] Véase, además: Chévere v. Levis, ante.

[9] Ruth Ortega-Vélez, Compendio de Derecho de Familia, San Juan, Publicaciones JTS, 2000, T. II, pág. 551 .

L.P.R.A. sec. 601, el cual establece, en lo aquí pertinente, que el padre y la madre tienen, respecto de sus hijos no emancipados, el deber de alimentarlos, tenerlos en su compañía, educarlos e instruirlos con arreglo a su fortuna, y representarlos en el ejercicio de todas las acciones que puedan redundar en su provecho.[10] Asimismo, el Artículo 142, 31 L.P.R.A. sec. 562, al regular los alimentos entre parientes, dispone que están recíprocamente obligados a darse alimentos: (i) los cónyuges; (ii) los ascendientes y descendientes; y (iii) el adoptante y el adoptado y sus descendientes. La tercera fuente estatutaria de esta obligación la encontramos en el Artículo 1308 del Código Civil, 31 L.P.R.A. sec. 3661, el cual preceptúa, en lo que aquí respecta, que el sostenimiento de la familia y la educación de los hijos comunes ––y de cualquiera de los cónyuges–– será de cargo de la sociedad de gananciales.

Vemos, pues, que a tenor con lo establecido en nuestro ordenamiento jurídico, la responsabilidad principal por los alimentos de los menores corresponde, de manera principalísima, al padre y a la madre, y en caso de divorcio, y subsiguiente matrimonio de alguno de éstos, de ordinario, a la nueva sociedad de gananciales constituida

---

[10] Como vemos, la obligación que establece esta disposición estatutaria no constituye propiamente un deber de alimentar autónomo o independiente, sino que se ha incorporado la obligación de alimentar al conjunto de deberes y derechos que emana de la patria potestad.

entre este último y el nuevo cónyuge.[11] Sobre este particular, en Figueroa Robledo v. Rivera, 149 D.P.R. 565, 578 (1999), señalamos que "[u]na vez decretado el divorcio, la obligación de alimentar a los hijos menores es una obligación personal de cada uno de los excónyuges que deberá ser satisfecha de su propio peculio, a excepción de aquellos casos en que el padre o madre alimentante haya contraído nuevas nupcias, en que la obligación será imputable a la nueva sociedad de gananciales que se haya constituido."[12] Claro, que para ello es indispensable que el nuevo matrimonio esté constituido bajo el régimen de sociedad legal de gananciales.

Sobre este particular, es importante recordar que nuestro ordenamiento jurídico deja --en cuanto a la institución del matrimonio se refiere-- a la discreción de

---

[11] En este caso, al fijar la pensión alimentaria de los menores, el tribunal deberá considerar el ingreso de ambos cónyuges a los fines de establecer la pensión alimentaria que corresponda a tenor con las disposiciones de la Ley Orgánica para el Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, 8 L.P.R.A. sec. 501 et. seq., y las Guías Mandatorias para la Fijación y Modificación de Obligaciones Alimentarias.

[12] Ello considerando lo expresado en Gabriela López v. Ernest Rodríguez, 121 D.P.R. 23 (1988), a los efectos de que "[b]ajo los términos de ésta [sociedad], todas las ganancias, sueldos o compensaciones que obtenga cada uno de los cónyuges como producto de su trabajo, industria, profesión, juegos legales, inversiones, rentas y otros que se perciban durante la vigencia de la Sociedad, pertenecen a ésta propiamente, y no al cónyuge que los gane." Véase, además: Artículo 1301 del Código Civil, 31 L.P.R.A. sec. 3641.

los contrayentes la organización de su propio régimen
económico. Acorde con lo anterior, los futuros cónyuges
pueden pactar en capitulaciones matrimoniales el régimen
económico que entiendan procedente y conveniente. A esos
efectos, el Artículo 1267 del Código Civil, 31 L.P.R.A.
sec. 3551, dispone que "los que se unan en matrimonio
podrán otorgar sus capitulaciones antes de celebrarlo,
estipulando las condiciones de la sociedad conyugal
relativa a los bienes presentes y futuros. . . ." Este
mismo Artículo preceptúa que, a falta de capitulaciones, o
cuando éstas sean nulas o insuficientes, los cónyuges se
casan bajo el régimen supletorio de la sociedad legal de
gananciales.[13] *Ibid.* Véase, además: Raúl Serrano Geyls,
Derecho de Familia de Puerto Rico y Legislación Comparada,
ante, a la pág. 282.

Según señaláramos en Domínguez Maldonado v. E.L.A.,
137 D.P.R. 954, 960 (1995), el contrato de capitulaciones
es de primordial importancia en el ámbito de la relación
patrimonial del matrimonio, en la medida en que permite
regular los derechos de los esposos sobre sus bienes
respectivos; los derechos sobre las ganancias realizadas
por ellos durante su unión; los intereses de los hijos y

---

[13] Adviértase que en este caso la ley "ejerce una función
supletiva de la voluntad, ya que sólo fija un régimen
económico legal para el caso de que no le hayan convenido
las partes." D. Calixto Valverde y Valverde, Tratado de
Derecho Civil Español, 4ta ed., Valladolid, 1938, T. IV,
pág. 285.

de la familia; los intereses de los terceros que contratan con uno u otro de los esposos, y, en definitiva, el interés económico y social del matrimonio. En ese sentido, hemos pautado que "aunque el propósito fundamental de realizar un pacto de capitulaciones matrimoniales es establecer el régimen económico que ha de imperar en el matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal." *Ibid*.

Lo anterior significa que en el contrato de capitulaciones los futuros cónyuges pueden estipular, no sólo las condiciones del régimen económico matrimonial, sino, además, aspectos no patrimoniales. Sobre este particular nos señala Castán que "se pueden incluir en las capitulaciones matrimoniales todos cuantos actos se puedan formalizar, conforme a las leyes, en documento público, aunque sean extraños al régimen matrimonial." José Castán Tobeñas, Derecho Civil Español, Común y Foral, 10ma ed., Madrid, Ed. Reus, 1983, T. V, pág. 317. Esto es, "en virtud del principio de autonomía de la voluntad que late en las capitulaciones matrimoniales, pueden las partes establecer en ellas, no sólo las cláusulas y condiciones que estimen convenientes, dentro de las bases mínimas admitidas, sino disciplinar sectores ajenos a la vida económica del matrimonio, en su sentido estricto."[14]

---

[14] Algunos tratadistas españoles, entre los que podemos mencionar a Manresa y Lacruz Berdejo, han entendido que los acuerdos en que los cónyuges pactan sobre asuntos

(Continúa . . .)

Federico Puig Peña, Compendio de Derecho Civil Español,
3ra ed., Madrid, Ed. Pirámide, S.A., 1976, T. V, pág. 132.

No cabe duda que, al pactarse de esta manera, sobre
cómo operará y se administrará la futura sociedad
conyugal, se manifiesta el principio de la autonomía de la
voluntad y la libertad individual de ambos cónyuges. Ruth
Ortega-Vélez, Compendio de Derecho de Familia, ante, sec.
6.2(2). Es al amparo de esta libertad que, al pactar sus
capitulaciones matrimoniales, una pareja puede optar por:
(i) la separación de bienes, pero con participación en las
ganancias; (ii) sociedad de gananciales (para lo cual
basta con guardar silencio y no estipular nada); (iii)
renunciar al régimen legal de gananciales; (iv) total
separación de bienes; (v) elegir cualquier otro régimen
que combine estas posibilidades siempre que no infrinja
las leyes, la moral o las buenas costumbres. Domínguez
Maldonado v. E.L.A., 137 D.P.R. 954, 964 (1995); Umpierre
v. Torres, 114 D.P.R. 450, 461-62 (1983).

Como vemos, los futuros cónyuges tienen amplia
libertad para determinar y estructurar el patrimonio
familiar, siempre y cuando al plasmar una u otra

_____

relacionados con los hijos o sobre sus relaciones
personales no constituyen propiamente estipulaciones
capitulares. Sin embargo, ambos tratadistas coinciden en
que la inclusión de este tipo de acuerdo no vicia de
nulidad la escritura capitular. J.M. Manresa y Navarro,
Comentarios al Código Civil Español, 6ta ed. rev., Madrid,
Ed. Reus, 1969, T. IX, Vol. 1, pág. 125; José Luis Lacruz
Berdejo, Derecho de Familia, Barcelona, Ed. Bosch, 1982,
T. IV, 325-26.

obligación, no contravengan la ley, la moral o el orden

público.[15] Otras limitaciones que se imponen a la voluntad

de los contratantes, y que han sido denominadas como

"pactos prohibidos" en las escrituras de capitulaciones,

son: (i) los contrarios a la naturaleza y a los fines del

matrimonio; (ii) los que inciden en la libertad y los

derechos del individuo; (iii) los que contravienen los

preceptos legales de carácter prohibitivo o imperativo; y

(iv) los que sean depresivos de la autoridad que

respectivamente corresponde en la familia a los futuros

cónyuges. Domínguez Maldonado v. E.L.A., ante a la pág.

960. Véase, además: J.M. Manresa y Navarro, Comentarios al

Código Civil Español, 6ta ed. rev., Madrid, Ed. Reus,

1969, T. IX, Vol. 1, pág. 141.

Por otro lado, y en lo que respecta a las formas y

solemnidades que nuestro ordenamiento jurídico exige para

este tipo de contrato, el Artículo 1273, 31 L.P.R.A. sec.

3557, preceptúa, en lo pertinente, que "las capitulaciones

matrimoniales y las modificaciones que se hagan en ellas

habrán de constar por escritura pública, otorgada antes de

la celebración del matrimonio." Esto es, la validez del

---

[15] Sobre este particular el Artículo 1268 del Código Civil, 31 L.P.R.A. sec. 3552, dispone, en lo aquí pertinente, que en las capitulaciones matrimoniales "los otorgantes [no podrán] estipular nada que fuere contrario a las leyes o a las buenas costumbres, ni depresivo de la autoridad que respectivamente corresponda en la familia a los futuros cónyuges." Asimismo, establece que "[t]oda estipulación que no se ajuste a lo preceptuado en esta sección se tendrá por nula."

contrato de capitulaciones se hace depender de <u>dos</u> supuestos básicos: que conste en escritura pública y que hayan sido otorgadas antes de la celebración del matrimonio.

En cuanto al primero de estos supuestos se ha entendido que se trata de un requisito de forma *ad solemnitatem* del cual depende la existencia y validez misma de las capitulaciones. Jaime Santos Briz, <u>Derecho Civil: Teoría y Práctica</u>, Madrid, Ed. Revista de Derecho Privado, (1982), T. V, pág. 127. Así, pues, las capitulaciones matrimoniales que no consten en escritura pública carecerán de toda validez y eficacia pues, según se ha entendido, estamos ante una condición para la existencia de la escritura y no ante un mero requisito de forma. J.M. Manresa y Navarro, <u>Comentarios al Código Civil Español</u>, ante, a las págs. 200-01.

Por otra parte, la exigencia de que las capitulaciones sean otorgadas <u>antes</u> de contraído el matrimonio es parte de una máxima que ha sido denominada como "la doctrina de inmutabilidad de las capitulaciones". La misma es establecida por nuestro Código Civil en su Artículo 1272, 31 L.P.R.A. sec. 3556, al disponer que luego de celebrado el matrimonio "no se podrán alterar las capitulaciones otorgadas antes...."[16] En ese sentido, hemos

---

[16] En <u>Vilariño Martínez</u> v. <u>Registrador</u>, 88 D.P.R. 288, 293 (1963), al explicar las razones para exigir que el contrato de capitulaciones se otorgue antes de la
(Continúa . . .)

pautado que "si existe[n] [capitulaciones matrimoniales], a e[lla] han de amoldarse los cónyuges y los terceros; no cabe después del matrimonio cambio ni modificación alguna, o, lo que es lo mismo no pueden esos cambios tener eficacia, pues las capitulaciones han de subsistir tales como fueron hechas antes del matrimonio."[17] Vilariño Martínez v. Registrador, 88 D.P.R. 288, 293 (1963) (énfasis suplido).

II

En el presente caso, la peticionaria Maldonado cuestiona la validez de las capitulaciones matrimoniales

---

celebración del matrimonio, expresamos que de este modo "los interesados están en condiciones de prestar libremente su consentimiento para tal otorgamiento, y que los terceros pueden conocer el régimen adoptado y las estipulaciones convenidas partiendo de una época fija, después de la cual no puede haber alteración."

[17] Del mismo modo, en Umpierre v. Torres Díaz, ante, a las págs. 457-59, señalamos que, aun cuando la doctrina de la inmutabilidad de las capitulaciones ha caído en desuso y ha sido abolida en los más modernos códigos, en Puerto Rico la Legislatura no ha tomado acción para acoger el principio de la mutabilidad, por lo que la prohibición del Artículo 1272, ante, continúa vigente y debe ser rigurosamente observada, so pena de nulidad. Evidencia de la rigurosidad de este principio es el Artículo 1274 del Código Civil, 31 L.P.R.A. sec. 3558, donde se exige la constancia de las alteraciones que se hagan a las capitulaciones, obviamente antes de la celebración del matrimonio, en el protocolo del notario por nota marginal. El referido precepto exige, además, que el notario haga constar las referidas alteraciones en las copias que expida, bajo pena de indemnización por daños si no lo hiciere.

otorgadas por los esposos Cruz-Arce. Su punta de lanza, o argumento principal, es que en el documento aquí en controversia las partes regularon no sólo asuntos relacionados con el patrimonio de su futuro matrimonio, sino que, además, reglamentaron aspectos relativos a su relación prematrimonial.[18] En tal virtud, solicita que declaremos la nulidad absoluta de las capitulaciones aquí en controversia y que, en consecuencia, concluyamos que el matrimonio de los esposos Cruz-Arce se rige por el régimen supletorio de sociedad legal de gananciales.

De entrada precisa señalar que coincidimos plenamente con el planteamiento de la peticionaria en torno a que la reglamentación de aspectos relativos a la relación consensual de los futuros cónyuges en capitulaciones, ciertamente, constituye una "desviación" de lo que "ordinariamente" encontramos en este tipo de contrato. Sin embargo, somos del criterio que tal inclusión, de forma alguna, puede tener el efecto de invalidar o anular el contrato de capitulaciones aquí en controversia.

Ya hemos señalado que en las capitulaciones matrimoniales las partes pueden pactar asuntos ajenos al régimen patrimonial y ello, por sí solo, no conlleva la nulidad de la escritura capitular. De este modo, se ha

---

[18] La peticionaria hace referencia a varias cláusulas en que las partes establecen que los acuerdos pactados aplicarían no sólo a su futuro matrimonio, sino también a su relación consensual; esto es, mientras permanecieran conviviendo juntos sin casarse.

establecido que en un contrato de capitulaciones las parejas pueden incluir cláusulas que, aunque relacionadas con el contrato principal, no constituyan propiamente estipulaciones o pactos capitulares. Así lo establecimos en Umpierre v. Torres Díaz, ante, a la pág. 459-60, donde, refiriéndonos al contrato de capitulaciones, expresamos que "'[s]e trata de un contrato' en que, con la salvedad de disposiciones por causa de muerte, '[c]abe que se mezclen otros contratos más o menos relacionados con el principal'."

Lo anterior explica que algunos tratadistas hagan referencia a la doctrina de "la divisibilidad del contrato de capitulaciones." Refiriéndose a este asunto el tratadista español José Santamaría ha expresado que "[p]ara todo lo que, aunque incluido en las capitulaciones, no constituya un verdadero pacto nupcial, se aplicarán las reglas generales de la contratación...." José Santamaría, Comentarios al Código Civil, Madrid, Ed. Revista de Derecho Privado, 1958, T. II, pág. 345. Siguiendo esta misma línea de pensamiento, nos expresa Castán que pueden "encontrarse en las capitulaciones cláusulas cuya subsistencia no esté subordinada a la celebración del matrimonio; por ejemplo, un reconocimiento de hijo natural hecho por uno de los futuros contrayentes o en provecho de uno de éstos por un tercero." José Castán Tobeñas, Derecho Civil Español, Común y Foral, ante, a la pág. 300. Asimismo, se ha señalado que "[t]ales cláusulas

conservarán su efecto aunque fracase el proyecto de matrimonio, porque ... se disgregan de las convenciones matrimoniales como un acto jurídico distinto y separado, ya no accesorio, sino principal." *Ibid.* Como vemos, estamos ante "un acto esencialmente complejo, y de gran amplitud, ... capaz de comprender negocios jurídicos que no tengan relación directa con el matrimonio futuro." José Castán Tobeñas, Derecho Civil Español, Común y Foral, ante a la pág. 297.

De lo antes expuesto se colige que, aun cuando el principio rector de la figura de las capitulaciones es establecer el régimen patrimonial que regirá durante el matrimonio, nada impide que en éstas se incluyan pactos o acuerdos que no constituyan propiamente estipulaciones capitulares o que no estén sujetos a la condición suspensiva de que se celebre el matrimonio. Ello, definitivamente, no constituye causa de nulidad ni convierte en ineficaces las escrituras de capitulaciones así otorgadas. Ya hemos señalado que las únicas limitaciones que tienen los futuros cónyuges a la hora de otorgar sus capitulaciones matrimoniales son aquellas que surgen de los Artículos 1268 y 1269 del Código Civil, 31 L.P.R.A. secs. 3552 y 3553, y las que se imponen al amparo de la doctrina general de los contratos.

A tenor con lo que disponen los referidos preceptos, se tendrán por nulas y no puestas todas las estipulaciones que sean contrarias a las leyes o a las buenas costumbres,

o depresivas de la autoridad de los futuros cónyuges.
También se tendrán por no puestas aquellas cláusulas en
que las partes hayan pactado, de manera general, que los
bienes de los cónyuges serán sometidos a costumbres
especiales, obviando por completo las disposiciones del
Código Civil.

Ahora bien, es de advertir que en estos casos la
nulidad se <u>circunscribe exclusivamente</u> a aquellas
cláusulas en que las partes hayan pactado acuerdos que
contravengan las limitaciones dispuestas en el Código,
entendiéndose con esto que <u>subsistirán</u> todas las demás
cláusulas capitulares, <u>siempre que</u> las mismas no estén
relacionadas con los pactos prohibidos.[19] Federico Puig
Peña, <u>Compendio de Derecho Civil Español</u>, ante, a la pág.
138; J.M. Manresa y Navarro, <u>Comentarios al Código Civil
Español</u>, ante, a la pág. 159. Ello a diferencia de lo que
ocurre en el caso de la nulidad absoluta, la cual tiene
lugar sólo bajo ciertas y determinadas circunstancias; a
saber: (i) en los casos en que las capitulaciones no hayan

---

[19] Sobre este particular nos expresa el tratadista español
Calixto Valverde que "la nulidad de un pacto no lleva
consigo la nulidad de todas las capitulaciones, así que el
contrato entero puede ser nulo, si sólo contiene una
estipulación; pero ordinariamente no ocurrirá esto, y
entonces valdrá el contrato, por lo menos, en lo relativo
a la determinación de los bienes aportados por cada
cónyuge, y en todo aquello que no se relacione con la
cláusula o el pacto prohibido." D. Calixto Valverde y
Valverde, <u>Tratado de Derecho Civil Español</u>, ante, a las
págs. 289-90.

sido otorgadas en escritura pública;[20] (ii) cuando el otorgamiento ha tenido lugar durante el matrimonio; (iii) si falta el consentimiento de alguna de las partes; y (iv) ante la ausencia o ilicitud del objeto o de la causa del contrato. Serrano Geyls, Derecho de Familia de Puerto Rico y Legislación Comparada, ante, a la pág. 307.

Luego de un análisis ponderado de la escritura de capitulaciones aquí en controversia forzoso resulta concluir que en el presente caso no está presente ninguna de las causas de nulidad absoluta antes mencionadas. Aquí la pareja otorgó su contrato en escritura pública y antes de contraer matrimonio; el consentimiento prestado por las partes no ha sido cuestionado; y tampoco estamos ante un caso de ilicitud del objeto o causa del contrato. Como señaláramos anteriormente, la única "particularidad" que encontramos en esta escritura es el hecho de que en la misma la pareja incluyó varias estipulaciones relativas a su relación consensual, lo cual --no cabe duda-- es poco usual en contratos de este tipo. Sin embargo, y en virtud del principio de la autonomía de la voluntad y la libertad individual que reviste esta clase de contratos, en el presente caso estamos impedidos de concluir que la

---

[20] Salvo el caso excepcional contemplado en el Artículo 1276 del Código Civil.

referida inclusión pueda, por sí sola, provocar la nulidad absoluta de la escritura bajo análisis.[21]

En vista de lo anterior, resolvemos que no erró el Tribunal de Apelaciones al confirmar la resolución del Tribunal de Primera Instancia en lo que respecta a la validez de la escritura de capitulaciones aquí en controversia.


## III

Nos corresponde atender el planteamiento de la peticionaria a los efectos de que las circunstancias específicas del caso de autos ameritan la celebración de una vista evidenciaria --con la señora Arce Rosado como parte indispensable-- que permita una determinación judicial en torno a si los esposos Cruz-Arce observan "meticulosa y religiosamente" el régimen de separación de bienes pactado en sus capitulaciones o si, por el contrario, la operación económica del matrimonio demuestra la existencia de una sociedad legal de gananciales.

---

[21] La peticionaria presentó, además, ciertos planteamientos en torno a la nulidad de varias cláusulas específicas, las cuales particularizó en su escrito. Sobre este particular bástanos con señalar que, luego de haber estudiado detenidamente todas y cada una de las cláusulas del contrato de capitulaciones aquí en controversia, no albergamos duda alguna en torno al hecho de que ninguna de éstas tiene el efecto práctico de anular absolutamente la escritura de capitulaciones bajo análisis, ni invalida el repudio que hicieron los contrayentes en torno al régimen económico de sociedad de gananciales.

Con el propósito de fundamentar su contención, la peticionaria trae a nuestra atención los pronunciamientos esbozados por este Tribunal en ocasión de resolver el caso Cepeda Torres v. García Ortiz, 132 D.P.R. 698 (1993). A esos efectos, argumenta que la norma allí establecida impide que los tribunales puedan desestimar de plano la causa de acción del "cónyuge extraño" --que ha sido traído al pleito de alimentos como parte indispensable-- una vez determinan que el matrimonio pactó válidamente en capitulaciones el régimen de total separación de bienes. A su entender, una vez el "cónyuge extraño" es emplazado y traído al pleito éste debe quedar sujeto al descubrimiento de prueba de rigor, y a las vistas evidenciarias que sean necesarias, incluyendo la entrega de sus planillas de contribución sobre ingresos y la Planilla de Información Personal y Económica que exige la Ley de Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, 8 L.P.R.A. sec. 501 *et. seq.*, independientemente del régimen económico conyugal que exista en el matrimonio. No estamos de acuerdo.

En primer lugar, aclaramos el alcance de los pronunciamientos esbozados por este Tribunal en Cepeda Torres v. García Ortiz, ante, donde reconocimos que en todo pleito de alimentos el nuevo cónyuge del padre o madre alimentante debe ser incluido como parte indispensable, aun en los casos en que se trate de un matrimonio sujeto al régimen económico de separación de

bienes. En aquel momento nos negamos a resolver los méritos de la controversia medular del caso --si ambos cónyuges tienen la obligación de alimentar a los hijos menores de edad habidos en el matrimonio anterior de uno de ellos independientemente del régimen económico conyugal-- por entender que estábamos ante un caso de falta de parte indispensable. Resolvimos que la esposa del padre alimentante debía tener una oportunidad efectiva para defender sus intereses, pues, según expresamos, su patrimonio podía verse afectado si finalmente se determinaba que sus ingresos debían ser utilizados a los fines de establecer la cuantía de la pensión alimentaria allí en controversia.

Dicho de otra forma, en el referido caso nuestros pronunciamientos se limitaron al asunto de la necesidad de que la esposa del padre alimentante fuese traída al pleito como parte indispensable, emplazándola y notificándola de todos los procedimientos, para evitar que sus derechos pudieran resultar perjudicados. De este modo, entendimos que, por imperativo del debido proceso de ley, la nueva esposa debía tener una oportunidad efectiva de defender, no sólo la validez de las capitulaciones pactadas, sino, además, el régimen económico allí estipulado.

Debe quedar claro que en el citado caso no resolvimos ni establecimos que la inclusión de esta parte constituía permiso para que el tribunal realizara una evaluación en

cuanto al comportamiento y los actos del matrimonio a los fines de determinar si la pareja observa, o no, el régimen económico pactado en capitulaciones y, a base de tal determinación, variar las estipulaciones capitulares válidamente pactadas. La razón es sencilla: un pronunciamiento a esos efectos no sólo iría en contra de los pronunciamientos esbozados por esta Curia en Domínguez Maldonado v. Santiago Ortiz, ante, sino que, además, daría al traste con la doctrina de inmutabilidad de las capitulaciones, y eso, según expresamos en Umpierre v. Torres, ante, a la pág. 459, sólo puede ser realizado por la vía legislativa. Véase, además: Domínguez Maldonado v. Santiago Ortiz, ante, a la pág. 963.

Debe mantenerse presente que en Domínguez Maldonado v. Santiago Ortiz, ante, este Tribunal rehusó enfáticamente reconocer la existencia de una sociedad legal de gananciales entre unos cónyuges que expresamente habían rechazado el régimen ganancial en sus capitulaciones matrimoniales, aun cuando éstos aceptaron que habían realizado actos de administración y de esfuerzo común. En aquella ocasión expresamos que resolver de otra manera tendría el efecto de "variar jurisprudencialmente la doctrina de la inmutabilidad de las capitulaciones matrimoniales." *Ibid.* a la pág. 966. Según señalamos, "[o]tra cosa sería si, como en Umpierre v. Torres Díaz, supra, en el contrato no se hubiese determinado el régimen económico que los interesados deseaban y, además, se

probara que la pareja usó y administró los bienes como si su matrimonio estuviese regido por una sociedad de gananciales, en las que ambos aportaban esfuerzo y trabajo personal." *Ibid*. a las págs. 966-67.

Hoy tenemos ante nos un cuadro fáctico similar al que nos enfrentamos al resolver el caso Domínguez Maldonado v. Santiago Ortiz, ante.[22] En sus capitulaciones matrimoniales los esposos Cruz-Arce rechazaron expresamente el régimen de sociedad legal de gananciales al manifestar su "repudio a los principios de la sociedad de gananciales y a las reglas que rigen esta entidad jurídica" y acoger el régimen de separación de bienes. Es por ello que, tal y como sucedió en Domínguez Maldonado v. Santiago Ortiz, ante, en el presente caso estamos impedidos de reconocer la existencia de una sociedad de gananciales; independientemente de que en su matrimonio los esposos Cruz-Arce hayan, o no, realizado actos de administración y esfuerzo común.[23]

_____

[22] Se diferencian en que en Domínguez Maldonado v. Santiago Ortiz, ante, aunque los cónyuges acordaron en sus capitulaciones que no regiría la sociedad económica de gananciales en el matrimonio a celebrarse entre ellos, éstos no indicaron bajo cuál régimen económico se regirían una vez contraído el matrimonio.

[23] Así lo expresa Manresa al señalar que si los interesados excluyen expresamente el régimen de la sociedad de gananciales, no cabe la aplicación del régimen legal supletorio que dispone el Código, pues "[i]mponer éste sería contrariar de un modo manifiesto la voluntad de las partes, la libertad de estipulación." J.M. Manresa y Navarro, Comentarios al Código Civil Español, ante, a la pág. 129.

(Continúa . . .)

Como expresáramos anteriormente en nuestra jurisdicción existe una <u>prohibición absoluta</u> en cuanto a la alteración o modificación de los acuerdos capitulares, prohibición que se activa tan pronto como la pareja contrae matrimonio.[24] 31 L.P.R.A. sec. 3556. Ello significa que si los esposos Cruz-Arce pactaron válidamente que su matrimonio se regiría por el régimen de separación de bienes, "no cabe después del matrimonio cambio ni modificación alguna, o, lo que es lo mismo, no pueden esos cambios tener eficacia, pues las capitulaciones han de subsistir tales como fueron hechas antes del matrimonio." <u>Vilariño Martínez</u> v. <u>Registrador</u>, ante, a la pág. 293 (citando a José Castán Tobeñas, <u>Derecho Civil Español, Común y Foral</u>, 5ta ed., Madrid, Ed. Reus, T. IX, págs. 144-45).

Es por ello que, <u>ante tales circunstancias</u>, consideramos <u>innecesaria e improcedente</u> la celebración de

_____

La misma conclusión se impone ante el planteamiento de la peticionario a los efectos de que la forma en que los cónyuges se distribuyeron las cargas familiares en sus capitulaciones evidencia la existencia de una comunidad de bienes entre ellos. Ello considerando que en el presente caso se pactó <u>expresamente</u> que el régimen que regiría durante el matrimonio sería el de separación absoluta de bienes.

[24] A tenor con lo que dispone el Artículo 1271 del Código Civil, 31 L.P.R.A. sec. 3555, para que sea válida cualquier alteración que se haga en las capitulaciones matrimoniales, ésta deberá tener lugar antes de celebrarse el matrimonio y con la asistencia y concurso de las personas que intervinieron como otorgantes en el contrato original.

una vista evidenciaria, pues, repetimos, la doctrina de la
inmutabilidad de las capitulaciones impide que los
tribunales puedan "restablecer" la sociedad de gananciales
que los cónyuges expresamente repudiaron en
capitulaciones. Ciertamente, no tiene ningún sentido
celebrar una vista a los fines de recibir una prueba que
al fin y al cabo no podrá cambiar --de forma alguna-- el
resultado final del caso.[25]

IV

No podemos finalizar sin antes atender ciertos
planteamientos levantados por la peticionaria Maldonado en
su intento por demostrar que la actual esposa del padre
alimentante es parte indispensable en el presente caso e
incluir sus ingresos en la determinación de la cuantía de
la pensión alimentaria de su hija menor. En primer lugar,
la peticionaria nos invita a adoptar en este contexto la

---

[25] Abona a nuestra conclusión el hecho de que en el caso de
marras, a diferencia de lo ocurrido en Domínguez Maldonado
v. Santiago Ortiz, ante, la pareja incluyó una cláusula
donde estipuló que interesaba mantener por separado la
propiedad y administración de todos sus respectivos bienes
presentes y futuros. Habiéndose pactado expresamente el
régimen económico de separación de bienes, y ante las
limitaciones que impone nuestro ordenamiento jurídico a la
mutabilidad de las cláusulas capitulares, es evidente que
en el presente caso no existe la necesidad de presentar
prueba tendente a demostrar cuál es el régimen económico
por el que se rige este matrimonio. Resolver lo contrario,
sin lugar a dudas, infringiría una herida mortal a la
"doctrina de la inmutabilidad de las capitulaciones", lo
cual definitivamente no le corresponde a los tribunales
sino a la Legislatura.

"doctrina de imputación de ingresos" a los fines de atribuirle al padre alimentante un ingreso adicional por cada una de las aportaciones económicas que la nueva esposa realiza en beneficio del hogar conyugal. A esos efectos, argumenta que el hecho de que el padre alimentante esté asumiendo las cargas del nuevo hogar conyugal implica que éste se está "empobreciendo" en detrimento de los alimentos que le corresponden a su hija menor. Según alega "en todo caso en que ocurre empobrecimiento voluntario de un alimentante, como premisa general, será indispensable imputarle ingresos adicionales al padre alimentante, como único medio de darle vigencia a la política pública de garantizar pensiones alimentarias para beneficio de los menores alimentistas."

Refiriéndonos, en primer lugar, al asunto del alegado "empobrecimiento" del patrimonio del señor Cruz Dávila, precisa señalar que ni en la Ley Especial de Sustento de Menores, ante, ni en las guías preparadas por el Departamento de Servicios Sociales para determinar y modificar las pensiones alimenticias, Reglamento Núm. 4070 de 8 de diciembre de 1989,[26] se toman en consideración --como deducciones permitidas-- las cargas o responsabilidades de un nuevo matrimonio a los fines de

---

[26] Estas guías están basadas en criterios numéricos y descriptivos y deben ser utilizadas en todo caso en que se solicite la fijación o modificación de pensiones alimentarias.

determinar la capacidad económica del padre o madre alimentante. Tal y como se desprende del texto del Artículo 2(17) de la Ley de Sustento de Menores, 8 L.P.R.A. sec. 501 (17),[27] las únicas deducciones que podrán ser realizadas al momento de calcular el montante de los recursos del padre o madre alimentante son: contribuciones sobre ingreso, seguro social y otras requeridas mandatoriamente por ley. Además, podrán considerarse los pagos por concepto de planes de retiro, asociaciones, uniones, federaciones voluntarias, primas o pólizas de seguros de vida, contra accidentes, o de servicios de salud, siempre que el alimentante logre demostrar que el menor con derecho a recibir alimentos, en alguna medida, se beneficia de los mismos. Martínez Vázquez v. Rodríguez Laureano, ante.

---

[27] El referido Artículo dispone, en lo aquí pertinente, lo siguiente:

> Aquellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingresos, seguro social y otras requeridas mandatoriamente por ley. Se tomarán en consideración, además, a los efectos de la determinación del ingreso neto, las deducciones por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o de servicios de salud cuando el alimentista sea beneficiario de éstos. La determinación final se hará según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente.

Es importante resaltar el hecho de que la Ley <u>no</u> <u>permite</u> que se haga ninguna deducción que no esté expresamente enumerada en el texto de este Artículo. Como bien señala la profesora Sarah Torres Peralta, "[e]l legislador se preocupó en hacer la relación precisa de los descuentos que se permitirán a los fines de determinar el ingreso neto del alimentante. Esto significa que no se permitirá ningún otro descuento que no aparezca en la enumeración taxativa del artículo [2(17)] de la Ley." Véase Sarah Torres Peralta, <u>La Ley Especial de Sustento de</u> <u>Menores y el Derecho de Alimentos en Puerto Rico</u>, San Juan, Publicaciones S.T.P., Inc., 1997, pág. 2.11.

Como vemos, las cargas familiares por las que el señor Cruz se responsabilizó al momento de otorgar la escritura de capitulaciones aquí en controversia --gastos personales y de ropa, gastos de hipoteca, mejoras del hogar y gastos de entretenimiento-- <u>definitivamente no son</u> <u>deducibles de su ingreso bruto, por lo que no podrán ser</u> <u>consideradas al momento de determinar la cuantía de la</u> <u>pensión alimentaria de su hija menor</u>. A tenor con la teoría que plantea la peticionaria, <u>no existiendo en el</u> <u>presente caso la posibilidad de un "empobrecimiento" en el</u> <u>patrimonio del padre alimentante, no procedería entonces</u> <u>hablar de una "imputación de ingresos" con relación a su</u> <u>patrimonio</u>.

Ahora bien, somos del criterio que, aún ante un empobrecimiento del patrimonio del señor Cruz, <u>es</u>

imposible adoptar en este contexto la "doctrina de imputación de ingresos". Son dos los axiomas que militan en contra de esta contención. En primer lugar, el hecho de que los cónyuges cumplan con la obligación legal de contribuir a las cargas familiares, definitivamente no está reñido con la existencia de un régimen de separación de bienes. Lo que ocurre más bien es una fusión *sui generis* donde cada uno de los consortes responde con sus bienes privativos por las cargas o responsabilidades propias del matrimonio.

Como señala unánimemente la doctrina española, el deber de socorrerse mutuamente y de satisfacer las cargas familiares no depende de la existencia de régimen económico conyugal alguno, sino del nacimiento de un vínculo matrimonial. José Luis Lacruz Berdejo, Derecho de Familia, ante, a la pág. 518; José Castán Tobeñas, Derecho Civil Español, Común y Foral, ante a las págs. 483-84; J.M. Manresa y Navarro, Comentarios al Código Civil Español, ante, a la pág. 15; Carlos Vázquez Iruzubieta, Régimen económico del matrimonio, Madrid, Ed. Derecho Reunidas, S.A., 1982, pág. 402; Ángel Luis Rebolledo Varela, Separación de bienes en el matrimonio, Madrid, Ed. Montecorvo, S.A., 1983, pág. 30-31. En ese sentido se ha entendido que ningún régimen --ni siquiera el de separación absoluta-- permite desconocer la realidad de una vida en común y de unas cargas que deben ser atendidas

por ambos cónyuges. José Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, T. IV, pág. 181.[28]

Tampoco podemos perder de vista el hecho de que nada en nuestro ordenamiento impide que, bajo el régimen de separación de bienes, se puedan pactar obligaciones económicas dispares, de acuerdo con o en proporción a los ingresos de los cónyuges, sin que se afecte de modo alguno la no responsabilidad del nuevo cónyuge, o tercero, respecto al deber de alimentar los hijos del cónyuge padre o madre. No es posible exigir que ambos cónyuges aporten exactamente lo mismo al matrimonio; esto es, que se dividan por mitad los gastos del mismo. Ello resulta imposible, incluso, en un matrimonio que se rige bajo la sociedad de bienes gananciales. Es por ello que no cabe hablar de que un cónyuge recibe "beneficios" por razón de que el otro cubre o paga una proporción mayor de los gastos en que se incurre en el matrimonio.

De otra parte, la tesis de la peticionaria tampoco logra superar los obstáculos que necesariamente impone la

---

[28] De este modo se ha expresado que "[e]l contribuir al levantamiento de las cargas del matrimonio es una obligación de los cónyuges cualquiera que sea el sistema matrimonial por el que se rijan." Luis Díez-Picazo y Antonio Gullón, Sistema de Derecho Civil, 5ta. Ed., Madrid, Ed. Tecnos, S.A., 1989, Vol. IV, pág. 233. Ciertamente, el mero hecho de la vida en común de los esposos y las atenciones familiares producen la necesidad de verificar aportaciones para atender las cargas que se generan, introduciendo un elemento asociativo que ya impide, de por sí, una absoluta independencia patrimonial. Bercovitz et al., Comentarios a las reformas del Derecho de familia, Madrid, Ed. Tecnos, S.A., Vol. II, 1984, pág. 1.918.

doctrina de la inmutabilidad de las capitulaciones. No albergamos duda alguna en cuanto al hecho de que la teoría de la peticionaria, a los efectos de que las aportaciones realizadas por la señora Arce al hogar familiar deben ser consideradas como "ahorros" a los gastos propios del alimentante, tiene el efecto directo de alterar el régimen de separación de bienes pactado por el matrimonio Cruz-Arce, creándose, en su lugar, un régimen semejante a lo que en nuestro ordenamiento jurídico conocemos como la sociedad legal de gananciales. Tal actuación está vedada por nuestro ordenamiento jurídico.

En fin, habiéndose pactado aquí una total separación de bienes estamos impedidos de crear, por fiat judicial, una sociedad legal de gananciales, sutilmente disfrazada tras la alegada "doctrina de imputación de ingresos". Hacerlo no sólo iría en contra de los pronunciamientos esbozados por este Tribunal en Domínguez Maldonado v. Santiago Ortiz, ante, sino que, además, tendría el efecto de abolir la doctrina de inmutabilidad de las capitulaciones en nuestra jurisdicción.[29] Estando ante un matrimonio que ha sido contraído bajo el régimen de total separación de bienes —lo cual implica que no existe

---

[29] En este caso también podría suscitarse un problema de intromisión en el derecho a la intimidad, pues, tal y como señala en su escrito la peticionaria, para realizar la "imputación de bienes" es necesario "escudriñar" en la relación matrimonial para determinar las aportaciones específicas que cada uno de los cónyuges hace al hogar conyugal.

sociedad de gananciales alguna-- los ingresos del esposo o esposa del padre o madre alimentante, simple y sencillamente, no pueden ser tomados en consideración para fines de fijar la pensión alimentaria de los hijos menores del padre o madre alimentante.[30]

V

Aun cuando en el día de hoy reiteramos la norma esbozada en Cepeda Torres v. García, ante --a los efectos de que en todo pleito de alimentos en que uno de los padres haya contraído nuevo matrimonio bajo el régimen de capitulaciones matrimoniales, el cónyuge extraño deberá ser traído al pleito como parte indispensable ante la posibilidad de que el tribunal determine la nulidad o ineficiencia de las capitulaciones pactadas o del régimen económico allí estipulado[31]-- resolvemos que el cónyuge extraño deberá ser excluido inmediatamente del pleito en la eventualidad de que el tribunal determine que la pareja pactó válidamente en sus capitulaciones el régimen de total separación de bienes. Dicho de otro modo, la determinación judicial de validez de las capitulaciones

---

[30] Ruth Ortega-Vélez, Compendio de Derecho de Familia, ante, sec.9.4(2), a la pág. 574; Lcda. Ixa López Palau, La Pensión Alimentaria de los Hijos en Puerto Rico; Guía para el Público General, págs. 41-42.

[31] En estas circunstancias el cónyuge extraño debe tener una oportunidad efectiva de defender, no sólo la validez de las capitulaciones, sino, además, el régimen económico allí pactado.

matrimoniales hace mandatoria e imperativa, la decisión de excluir al cónyuge extraño del procedimiento de alimentos pendiente. Ciertamente, resolver que las capitulaciones matrimoniales son totalmente válidas y, aún así, mantener al cónyuge extraño como parte en el pleito resulta ser un gravísimo error y/o una enorme contradicción.

Ya hemos señalado que, en lo referente a derechos de alimentos, nuestro ordenamiento jurídico está fundamentado, de manera principalísima, en relaciones de parentezco, no reconociéndose derechos de alimentos entre terceros o parientes por afinidad.[32] Ello, naturalmente, permite que se plasme la no responsabilidad del tercero, relativa a tal obligación, en una escritura pública sobre capitulaciones matrimoniales. Habiéndose determinado en el presente caso la validez de las capitulaciones en que los esposos Cruz-Dávila repudiaron expresamente el régimen de sociedad legal de gananciales, acogiendo en su lugar el de separación absoluta, la única conclusión que se impone es a los efectos de que la señora Arce Rosado debe ser excluida del presente pleito, como correctamente dictaminaron tanto el tribunal de instancia como el tribunal apelativo intermedio.

VI

---

[32] La única excepción a esto es el caso de los alimentos entre ex cónyuges.

En mérito de lo antes expuesto, se confirma el dictamen emitido por el Tribunal de Apelaciones en el presente caso.

Se dictará Sentencia de conformidad.


                        FRANCISCO REBOLLO LÓPEZ
                            Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Ivette Maldonado

    Peticionaria

        v.

                   CC-2000-154     CERTIORARI

Elwood Cruz Dávila

    Apelado

Gladys Arce

    Apelada

SENTENCIA

San Juan, Puerto Rico, a 8 de enero de 2004

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria del dictamen emitido por el Tribunal de Apelaciones en el presente caso.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Presidenta señora Naveira Merly emitió Opinión disidente a la cual se unió el Juez Asociado señor Fuster Berlingeri. El Juez Asociado señor Rivera Pérez inhibido.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Ivette Maldonado

    Peticionaria

       v.

Elwood Cruz Dávila                     CC-2000-154

    Recurrido

Gladys Arce

    Recurrida

Opinión Disidente emitida por la Jueza Presidenta señora NAVEIRA MERLY a la que se une el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico a 8 de enero de 2004

La adjudicación del presente recurso amerita que hagamos un balance entre dos (2) intereses que inciden sobre la relación familiar —la obligación de alimentar a los hijos menores de edad y la autonomía de la voluntad para estipular el régimen económico matrimonial. Por entender que la decisión de la mayoría tiene el efecto de validar automáticamente unas capitulaciones matrimoniales que podrían menoscabar el bienestar de los hijos menores de edad habidos en un matrimonio previo y su derecho a recibir alimentos, disentimos.

I

El 6 de marzo de 1992, el Tribunal de Primera Instancia, Sala Superior de Carolina, decretó el divorcio por consentimiento mutuo de la Sra. Wanda Ivette Maldonado y el Sr. Elwood Cruz Dávila. Conforme a la petición de divorcio presentada por éstos, el tribunal determinó que la señora Maldonado tendría la custodia de la hija menor procreada durante el matrimonio; que la patria potestad sería compartida por ambos progenitores; y que el señor Cruz Dávila pagaría una pensión alimentaria de ciento sesenta dólares ($160.00) mensuales.

El 28 de enero de 1995 el señor Cruz Dávila contrajo nupcias con la Sra. Gladys Arce.  Ocho (8) días antes de la celebración del matrimonio, el 18 de enero de 1995, éstos otorgaron una escritura de capitulaciones matrimoniales.  En la misma estipularon, entre otras cosas, que **repudiaban los principios de la sociedad legal de gananciales**; que dichas reglas no aplicarían en su relación consensual ni en el matrimonio a ser contraído por éstos; y que **el régimen económico de su relación consensual y de su matrimonio sería el de separación de bienes.**  También estipularon las deudas familiares y del hogar de las cuales se haría cargo uno y otro cónyuge, así como las deudas privativas de éstos.  **Acordaron, además, que compartirían la responsabilidad económica por los hijos que procrearan en común, pero que la responsabilidad por alimentar los hijos o parientes de uno u otro cónyuge sería privativa de éste.**

El 7 de mayo de 1996 la señora Maldonado presentó una moción solicitando aumento de pensión alimentaria a por lo menos ochocientos dólares ($800.00) mensuales. Además, incluyó como parte demandada a la señora Arce, quien fue debidamente emplazada. La señora Maldonado adujo en la moción que, independientemente del régimen económico bajo el cual la señora Arce y el señor Cruz Dávila hubiesen contraído matrimonio, la actual esposa de éste era "parte realmente interesada en este procedimiento, por cuanto es persona con ingresos mensuales sustanciales provenientes de su empleo, con las aportaciones correspondientes a la manutención del hogar conyugal que tiene establecido con el padre".

La señora Arce presentó una moción de sentencia sumaria, en la cual señaló que aunque de ordinario la responsabilidad por el sostenimiento de la familia y la educación de los hijos comunes y de cualquiera de los cónyuges corresponde a la sociedad legal de gananciales, habiéndose pactado expresamente entre ella y el señor Cruz Dávila el régimen de separación de bienes y el repudio al régimen económico ganancial, no procedía que se le impusiera responsabilidad personal por los alimentos de la menor hija de su esposo, ni que se tomaran en cuenta sus ingresos para computar la cuantía de la pensión alimentaria que el señor Cruz Dávila debía satisfacer a favor de la menor.[33]

La señora Maldonado presentó una oposición juramentada a la moción de sentencia sumaria. Alegó que de la propia escritura de

---

[33] Con esta moción acompañó copia de la escritura de capitulaciones matrimoniales y una declaración jurada en la cual sostuvo que seguía fielmente el régimen de separación de bienes pactado entre ella y su esposo.

capitulaciones matrimoniales surgía su nulidad ya que: (1) regulaban la vida prematrimonial y post divorcio de los esposos Cruz-Arce; (2) de sus propias cláusulas se desprendía la existencia de una comunidad de bienes en la cual cada cónyuge tenía asignados una serie de gastos del hogar y la familia; y (3) expresamente señalaban que la señora Arce no tendría obligación de alimentar a los hijos del señor Cruz habidos en otro matrimonio. Señaló, además, que la controversia no era susceptible de resolverse por la vía sumaria ya que era necesario celebrar una vista evidenciaria para determinar si entre los cónyuges surgió una sociedad legal de gananciales. En la alternativa, adujo que precisaba celebrar una vista evidenciaria, con la señora Arce como parte indispensable, para cuantificar las aportaciones que ésta hacía al hogar y de esta forma imputar la suma restante al señor Cruz Dávila como ingreso bruto a los fines de fijar la cuantía de la pensión alimentaria.[34]

Así las cosas, el 5 de marzo de 1997 la señora Maldonado y el señor Cruz Dávila presentaron una estipulación ante el tribunal de instancia en la cual establecieron que el señor Cruz Dávila pagaría una pensión alimentaria de quinientos dólares ($500.00) mensuales, más las mensualidades del colegio, gastos escolares relacionados y el plan médico de la menor. Luego de varios incidentes procesales, el foro de instancia dictó sentencia de

---

[34] Cabe señalar que no surge del expediente que la señora Maldonado hubiese solicitado tiempo para realizar un descubrimiento de prueba que le permitiese obtener la prueba necesaria para refutar las aseveraciones de la señora Arce.

acuerdo con dicha estipulación, la cual fue notificada el 4 de marzo de 1998.

Aproximadamente cuatro (4) meses más tarde, el 1 de julio de 1998, la señora Maldonado presentó una nueva moción solicitando aumento de pensión alimentaria en la cual incluyó como partes en el epígrafe al señor Cruz Dávila, la señora Arce y **la sociedad legal de gananciales compuesta por ambos.** Alegó que luego de la fecha de la estipulación sobre alimentos ocurrieron cambios significativos, sustanciales e imprevistos que justificaban su petición de aumento de pensión. Señaló la señora Maldonado que los ingresos del padre alimentante y de su sociedad de gananciales habían aumentado sustancialmente, así como también los gastos de la menor, mientras que sus ingresos habían disminuido significativamente luego de la fecha de la estipulación. En consecuencia, solicitó un aumento de pensión a por lo menos mil quinientos dólares ($1,500.00) mensuales.

La señora Arce compareció nuevamente y presentó una moción de desestimación de la demanda en cuanto a su persona. A esta moción incorporó por referencia las alegaciones que hiciera en su solicitud de sentencia sumaria y reiteró que por haber contraído matrimonio bajo el régimen de separación de bienes, sus ingresos no deberían ser considerados al determinar la pensión alimentaria de la menor.

Por su parte, el señor Cruz Dávila se opuso al aumento de pensión alimentaria alegando que la cantidad solicitada era irrazonable, pues él cubría todos los gastos de la menor, incluyendo la matrícula del colegio, las mensualidades escolares,

el plan médico, las clases de ballet y los deducibles médico-hospitalarios. Indicó, además, que si su esposa era incluida en el pleito, aun habiéndose casado bajo el régimen de separación de bienes, sería entonces imperativo traer como parte indispensable al nuevo esposo de la señora Maldonado, el Sr. Antonio Dorán, de quien la peticionaria alegó que dependía económicamente.[35] El tribunal de instancia celebró una vista el 22 de febrero de 1999 en la cual estuvieron presentes el señor Cruz Dávila, la señora Maldonado y su esposo, el señor Dorán. En ésta las partes llegaron a una serie de acuerdos en torno a las relaciones paterno-filiales.

El 19 de marzo de 1999 el foro de instancia dictó sentencia desestimando sumariamente la demanda en solicitud de aumento de pensión alimentaria respecto a la señora Arce, por ésta haber contraído matrimonio con el padre alimentante luego de otorgar capitulaciones matrimoniales estableciendo el régimen de separación de bienes. De esta determinación recurrió la señora Maldonado ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito), alegando que las capitulaciones matrimoniales eran nulas y que era necesario celebrar una vista evidenciaria para determinar cuál era el verdadero régimen económico del matrimonio y si procedía que se le imputaran al señor Cruz Dávila ingresos adicionales a raíz de las aportaciones económicas de la señora Arce al hogar conyugal.

---

[35] El señor Cruz Dávila también indicó que se proponía solicitar la revisión de la pensión alimentaria "en base a los ingresos de la promovente y su esposo actual". Sin embargo, no surge del expediente que el señor Dorán hubiese sido posteriormente emplazado en el pleito que nos ocupa.

El Tribunal de Circuito dictó sentencia en la que confirmó el dictamen del foro primario. Resolvió que la escritura de capitulaciones no era nula y que, aun de existir alguna cláusula contraria a la ley, ésta se tendría por no puesta y no afectaba el resultado del caso. Concluyó, además, que la obligación de sostener a los hijos comunes y de cualquiera de los cónyuges correspondía a la sociedad legal de gananciales, régimen que específicamente rechazaron los esposos Cruz-Arce en sus capitulaciones, por lo que el sostenimiento de la menor correspondía únicamente a su padre, el señor Cruz Dávila. Finalmente, el foro apelativo concluyó que no era necesaria una vista evidenciaria para determinar cuál era el régimen económico del matrimonio Cruz-Arce o para evaluar cuál era la aportación económica de la señora Arce al matrimonio y así cuantificar los ingresos adicionales que debían imputársele al señor Cruz Dávila.

Inconforme, la señora Maldonado recurrió ante nos mediante recurso de *certiorari*. Alegó, en síntesis: (1) que la escritura de capitulaciones era nula en su forma y contenido, pues extendía la aplicación de sus cláusulas a la relación pre y post matrimonial de los señores Cruz-Arce, por contener cláusulas contradictorias entre sí y por contener cláusulas contrarias a la ley; (2) que a la luz de las cláusulas de la escritura, correspondía que se celebrase una vista evidenciaria a los fines de determinar cuál era el verdadero régimen económico del matrimonio, pues la escritura realmente establecía una comunidad de bienes entre los esposos Cruz-Arce; y (3) que en las circunstancias del presente caso era de aplicación la doctrina de

imputación de ingresos, la cual requiere que en casos en que se haya pactado la separación de bienes se determine en forma específica cuáles son las aportaciones de cada cónyuge al hogar y la familia al momento de fijar la pensión alimentaria.

Examinemos los preceptos aplicables al recurso de autos.

II

La controversia ante nos requiere que determinemos si actuaron correctamente el foro de instancia y el apelativo al desestimar sumariamente la demanda en cuanto a la señora Arce por entender que las capitulaciones matrimoniales otorgadas entre ésta y su esposo eran válidas.[36]

La sentencia sumaria es un remedio extraordinario y discrecional que sólo debe concederse cuando no existe una controversia genuina sobre hechos materiales y lo que resta es aplicar el Derecho, por lo que no hay necesidad de celebrar una vista evidenciaria. Véanse *Sánchez Montalvo v. Autoridad de Puertos*, res. el 7 marzo de 2001, 153 D.P.R. _____ (2001), 2001 T.S.P.R. 30, 2001 J.T.S. 34; *Consejo de Titulares v. M.G.I.C. Financial*, 128 D.P.R. 538, 548-549 (1991); *Corp. Presiding Bishop v. Purcell*, 117 D.P.R. 714, 719-723 (1986). Cualquier duda sobre la existencia de una controversia sobre los hechos materiales debe

---

[36] Aunque el tribunal de instancia tuvo ante sí una moción de sentencia sumaria y una moción de desestimación, entendemos que lo que se dictó en este caso fue realmente una sentencia sumaria, pues a la moción de desestimación se incorporaron por referencia todas las alegaciones hechas en la moción de sentencia sumaria original y, por ende, todos los documentos presentados con ésta.

resolverse contra la parte promovente.  La sentencia sumaria puede dictarse a favor o en contra de la parte que la solicita, según proceda en Derecho.  El propósito de este mecanismo procesal es "aligerar la tramitación de un caso permitiendo que se dicte sentencia sin necesidad de que se tenga que celebrar la vista en los méritos, cuando de los documentos no controvertidos que se acompañan con la solicitud surge que 'no existe una legítima disputa de hecho a ser dirimida, ... sólo resta aplicar el derecho."  Véanse *Corp. Presiding Bishop CJC of LDS v. Purcell*, *supra*, pág. 720 (1986); *Marín v. American Int'l Ins. Co. of P.R.*, 137 D.P.R. 356 (1994); *Soto v. Hotel Caribe Hilton*, *supra*; *Pilot Life Ins. Co. v. Crespo Martínez*, 136 D.P.R. 624 (1994).

"Como regla general, se dicta sentencia sumaria a base de los documentos admisibles en evidencia sometidos por el promovente con su moción, los documentos sometidos por la parte promovida con su moción en oposición y aquellos que obran en el expediente del tribunal".  *Medina v. Merck, Sharp & Dome*, 135 D.P.R. 716, 726 (1994).  La parte promovida solamente podrá derrotar la moción de sentencia sumaria presentando oposición acompañada con prueba admisible en evidencia que controvierta o rebata la evidencia afirmativa presentada por el promovente ya que en la sentencia sumaria no se dirime credibilidad.  *Id.*, págs. 732-733.[37]

Ahora bien, por ser la sentencia sumaria un remedio discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a

---

[37]     Sobre el mecanismo de sentencia sumaria, véase José A. Cuevas Segarra, *Tratado de Derecho procesal civil*, Tomo I, Publicaciones J.T.S., 2000, págs. 590-619.

un litigante de 'su día en corte', principio elemental del debido procedimiento de ley". *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 613, 617 (1990). Así, pues, existen litigios y controversias que por su naturaleza no hacen deseable o aconsejable resolverlos mediante sentencia sumaria, porque difícilmente en tales casos el tribunal puede tener ante sí toda la verdad de los hechos a través de declaraciones juradas o deposiciones. *Soto v. Hotel Caribe Hilton*, *supra*, pág. 301, citando a *García López v. Méndez García*, 88 D.P.R. 363, 380 (1963).

A la luz de los principios expuestos, corresponde que analicemos si la prueba que tuvo ante sí el tribunal de instancia era suficiente para determinar sumariamente que la escritura de capitulaciones matrimoniales de los esposos Cruz-Arce era válida como cuestión de derecho y, además, concluir que no procedía imputarle ingresos al señor Cruz Dávila en virtud de su matrimonio con la señora Arce. Para hacer esta determinación es necesario examinar, en primer término, las disposiciones relacionadas con las capitulaciones matrimoniales, en conjunto con el derecho de alimentos de los hijos menores de edad.

III

Nuestro ordenamiento reglamenta los efectos económicos del matrimonio respecto a los cónyuges y respecto a terceros. De esta forma se admiten las capitulaciones matrimoniales, que pueden definirse como el contrato celebrado entre los futuros cónyuges,

con anterioridad al matrimonio, "con el fin casi exclusivo de fijar el régimen a que deben sujetarse los bienes del mismo". Francisco Fortuny Comaposada, *El régimen de bienes en el matrimonio*, Colección Nereo, 1962, pág. 9. El Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551, dispone que "los que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, estipulando las condiciones de la sociedad conyugal relativamente a los bienes presentes y futuros sin otras limitaciones que las señaladas en este título".

Como regla general y dentro del principio de autonomía de la voluntad que impera en nuestro sistema de contratación, las capitulaciones matrimoniales admiten toda clase de pactos. Sin embargo, en este contrato la autonomía de las partes no es absoluta ya que están prohibidos los pactos que sean contrarios a la naturaleza y los fines del matrimonio; que contravengan preceptos legales de carácter prohibitivo o imperativos; y que sean depresivos de la autoridad que corresponde respectivamente a los futuros cónyuges en la familia. Art. 1268 del Código Civil, 31 L.P.R.A. sec. 3552; *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954, 960 (1995).

En las capitulaciones matrimoniales los futuros cónyuges pueden optar por: (1) la separación de los bienes pero con participación en ganancias; (2) la sociedad de gananciales, para lo cual basta con guardar silencio; (3) renunciar al régimen ganancial; (4) la total separación de bienes; o (5) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. De

otra parte, los futuros esposos pueden pactar, además del régimen económico, acuerdos relativos a la gestión de cada uno de los cónyuges en sus bienes propios y la intervención en ellos del otro e, inclusive, establecer donaciones por razón de matrimonio. *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 460 (1983). Véanse José Castán Tobeñas, *Derecho civil español, común y foral*, Tomo V, Vol. I, 11ma ed., Reus, 1987, págs. 331-332; Manuel Albaladejo, *Compendio de Derecho civil*, Ed. Bosch, 3ra ed., 1976, págs. 516-517.[38] Anteriormente **hemos reconocido que aunque el propósito fundamental de realizar un pacto de capitulaciones es establecer el régimen económico que ha de imperar en el matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal**. *Domínguez Maldonado v. E.L.A.*, *supra*, págs. 960-961.

La razón para que se reconozca cierta liberalidad en relación a la clase de pactos que pueden establecerse mediante capitulaciones matrimoniales es que nuestro Código Civil, aunque reconoce el régimen económico matrimonial de separación de bienes, no dispone expresamente cuales serán las reglas que han de seguirse para atender las cargas económicas del matrimonio en estos casos, ni para disponer de los bienes en caso de disolución del matrimonio. Lo contrario ocurre en cuanto a la sociedad de

---

[38] Además, las capitulaciones pueden regular "los derechos de los esposos sobre sus bienes respectivos, los derechos sobre las ganancias realizadas por ellos durante su unión; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otro de los esposos; y, en definitiva, el interés económico y social, muy afectado por la solución que se dé a los problemas que el régimen matrimonial lleva consigo". Castán Tobeñas, *supra*, pág. 309.

ganaciales, la cual está regulada extensamente por el Código Civil. Es por ello que al interpretar una escritura de capitulaciones matrimoniales, hay que examinar cuidadosamente aquellos acuerdos que los cónyuges han establecido para reglamentar su relación económica.

Lo anterior cobra fundamental importancia ante el hecho de que en nuestro ordenamiento aún impera el principio de inmutabilidad de las capitulaciones matrimoniales. Según éste, una vez celebrado el matrimonio, las capitulaciones no pueden ser modificadas, ni siquiera con el mutuo acuerdo de los cónyuges. Arts. 1271 y 1272 del Código Civil, 31 L.P.R.A. secs. 3555 y 3556. La vigencia de esta doctrina en nuestro ordenamiento ha dado lugar a varias controversias presentadas ante este Foro en las cuales uno o ambos cónyuges, que han otorgado capitulaciones matrimoniales, han querido establecer o probar que durante su matrimonio no han seguido tal régimen de separación de bienes.[39]

En *Domínguez Maldonado v. E.L.A.*, *supra*, un matrimonio presentó una solicitud de sentencia declaratoria para que el tribunal decretase que entre ellos existía una sociedad legal de ganaciales, aunque habían otorgado capitulaciones matrimoniales en las cuales guardaron silencio con relación al régimen económico del matrimonio, pero indicaron que no regiría la sociedad legal de ganaciales. En estas circunstancias resolvimos, de acuerdo al principio de inmutabilidad, que cuando una pareja otorga un contrato de capitulaciones y expresamente pacta que no desea que

---

[39] La doctrina de inmutabilidad de las capitulaciones ha sido desterrada de una gran parte de los códigos civilistas modernos.

surja el régimen ganancial, el hecho de que durante el matrimonio lleven a cabo actos de administración y esfuerzo común, no genera entre dichos cónyuges una sociedad legal de gananciales.[40]

De otra parte, en *Umpierre v. Díaz*, 114 D.P.R. 449 (1983), atendimos el reclamo de una ex esposa que alegaba que entre ella y su ex cónyuge había surgido una sociedad legal de gananciales aun cuando éstos habían otorgado capitulaciones matrimoniales. En ese caso, de acuerdo con la evidencia presentada, reconocimos la existencia de una sociedad legal de gananciales ya que, contrario a *Domínguez*, en la escritura de capitulaciones no se rechazó expresamente el régimen ganancial, como tampoco se estableció específicamente que existiría entre los cónyuges una total separación de bienes.

Como se puede apreciar, no ha sido tarea fácil para este Tribunal trazar los contornos del régimen económico de la separación de bienes durante el matrimonio cuando uno o ambos cónyuges han pretendido impugnar la validez de sus capitulaciones matrimoniales y los acuerdos establecidos en éstas.[41] Dicha tarea se hace aún más difícil cuando, como en el caso de autos, se trata

---

[40] Finalmente, devolvimos el caso con instrucciones de que se celebrase una vista evidenciaria donde la señora Santiago pudiese presentar prueba de que entre ésta y su esposo existió una comunidad de bienes.

[41] Lo anterior quedó ejemplificado en el caso de *Cruz Ayala v. Rivera Pérez,* 141 D.P.R. 44 (1996). En la citada decisión, revocamos una sentencia dictada por el tribunal de instancia que resolvió que una propiedad adquirida durante el matrimonio entre la Sra. Yolanda Rivera Pérez y el Sr. José Cruz Ayala, quienes se habían casado bajo capitulaciones matrimoniales donde pactaron el régimen de separación de bienes, pertenecía únicamente al señor Cruz Ayala. En este caso no hubo opinión del Tribunal, ya que los Jueces estaban divididos en cuanto a los fundamentos adecuados para revocar la sentencia recurrida.

de una tercera persona, ajena al matrimonio y que no ha sido parte del contrato de capitulaciones, quien intenta impugnar la validez de éstas y establecer que en la realidad el matrimonio no ha seguido el régimen económico de separación de bienes pactado.

No es la primera vez que se presenta ante nos una controversia similar a la de autos. En *Cepeda v. García*, 132 D.P.R. 698 (1993), la señora Cepeda, ex esposa del señor García, solicitó un aumento en la pensión alimentaria que éste pagaba. Como parte de dicho procedimiento, se le cursó al señor García un interrogatorio solicitándole información sobre los ingresos, gastos y ocupación de su nueva esposa, con la cual se había casado bajo capitulaciones matrimoniales estableciendo el régimen de separación de bienes. El señor García se negó a proveer dicha información aduciendo que ésta era inmaterial pues había contraido matrimonio bajo capitulaciones matrimoniales y, además, su esposa no era parte en el procedimiento.

El foro de instancia concluyó que, aun existiendo separación de bienes, era menester contestar las preguntas del interrogatorio referentes a los ingresos de la nueva esposa ya que ambos cónyuges eran responsables de los alimentos de los menores procreados en matrimonios anteriores. Inconforme, el señor García recurrió ante nos señalando que había incidido el tribunal al concluir que los ingresos de su nueva esposa tenían que ser considerados para determinar la cuantía de aumento de la pensión y que, además, él carecía de autoridad para representar a su esposa en el pleito, quien no había sido emplazada. Al resolver la controversia, no nos expresamos sobre si procedía o no incluir o tomar en

consideración los ingresos de la nueva esposa, ya que concluimos que antes de hacer cualquier determinación sobre el particular, era necesario que ésta fuese emplazada, por ser parte indispensable. Así, pues, nuestra jurisprudencia no ha confrontado previamente la impugnación de unas capitulaciones matrimoniales por un tercero y, específicamente, cuando se alega que el contrato capitular menoscaba el derecho de una menor de edad de recibir alimentos.

IV

Sabido es que en nuestra jurisdicción la obligación de los progenitores de proveer alimentos a sus hijos se manifiesta a la luz del derecho a la vida consagrado en el Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. L.P.R.A., Tomo I; *Chévere v. Levis I*, res. el 15 de marzo de 2000, 150 D.P.R. _____ (2000), 2000 J.T.S. 56, 2000 T.S.P.R. 42. **La obligación de los padres de proveer alimentos a sus hijos menores está revestida del más alto interés público** y, por tanto, el Estado ha legislado ampliamente para segurar su cumplimiento. *Martínez Vázquez v. Rodríguez Laureano*, res. el 13 de agosto de 2003, 160 D.P.R. _____ (2003), 2003 J.T.S. 134, 2003 T.S.P.R. 134; López v. Rodríguez, 121 D.P.R. 23, 28 (1988); *Ex parte Negrón Rivera y Bonilla*, 120 D.P.R. 61 (1987). Esta obligación incluye todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia. Art. 142 del Código Civil, 31 L.P.R.A. sec. 561.

Existe una clara política pública de procurar que los padres o las personas legalmente responsables contribuyan a la manutención de sus hijos en la medida en que sus recursos se lo permitan. Véanse Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, Ley Orgánica de la Administración para el Sustento de Menores, 8 L.P.R.A. sec. 8; *Soto Cabral v. E.L.A.*, 138 D.P.R. 298 (1995). El deber de alimentar, de educar y de criar a los hijos menores es producto de ser padre o madre y se origina desde el momento en que la paternidad o maternidad quedan establecidos. *Chévere v. Levis I, supra*; *Chévere v. Levis II,* res. el 3 de noviembre de 2000, 152 D.P.R. _____ (2000), 2000 J.T.S. 175, 2000 T.S.P.R. 163.

La obligación de los padres de proveer alimentos a sus hijos tiene esencialmente dos (2) fuentes estatutarias en el Código Civil. Una de ellas surge del Art. 153, 31 L.P.R.A. sec. 601, que establece como parte de los deberes y obligaciones del padre y la madre el alimentar a sus hijos menores. Este deber no depende del estado de necesidad del hijo, sino que emana directamente del hecho de la paternidad o maternidad y se ha interpretado como parte del conjunto de derechos y obligaciones que emanan de la patria potestad. *Chévere v. Levis, supra*. La segunda fuente de los alimentos para los hijos menores de edad surge del Art. 143, 31 L.P.R.A. sec. 562, que dispone que los ascendientes y descendientes están obligados a darse alimentos. Esta obligación no requiere que el hijo sea menor de edad. En tales casos, el derecho a recibir alimentos se fundamenta en el estado de

necesidad del hijo y depende de la condición económica del padre alimentante. *Ch[evere v. Levis I, supra.*

De otra parte, el Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661, impone **a la sociedad de bienes gananciales** la obligación de velar por "el sostenimiento de la familia y la educación de los hijos comunes **y de cualquiera de los cónyuges**". (Énfasis suplido.) Más aún, cualquier nueva sociedad de gananciales que se cree será responsable del sustento y de los alimentos de los hijos menores de edad habidos en un matrimonio anterior de alguno de sus componentes. En consecuencia, cuando cualquiera de los padres constituye un nuevo matrimonio bajo el régimen ganancial, el tribunal, al fijar o de alguna manera modificar una pensión alimentaria que deba pagar uno de los cónyuges, deberá tomar en consideración la capacidad económica de la nueva sociedad conyugal, ya que puede presumirse razonablemente que bajo el régimen ganancial el padre o madre que se ha casado habrá de beneficiarse de los ingresos y bienes adquiridos por la sociedad y/o su cónyuge. Art. 145 del Código Civil, 31 L.P.R.A. sec. 564; *López v. Rodríguez*, 121 D.P.R. 23, 30-31 (1988). A tenor de lo anterior, hemos resuelto que cuando los padres se separan o divorcian, la obligación de alimentar a los hijos menores **es una personal de <u>cada uno de los ex cónyuges que deberá ser satisfecha de su propio peculio</u>, a excepción de aquellos casos en que el padre o madre alimentante haya contraído nuevas nupcias, en que la obligación será imputable <u>a la nueva sociedad de gananciales</u> que se haya constituido.** *Figueroa Robledo v. Rivera Rosa*, res. el 22 de octubre de 1999, 149 D.P.R. 565, 578 (1999).

Ahora bien, el pacto de una pareja de establecer la separación de sus bienes mediante capitulaciones matrimoniales, tiene el efecto de que con el subsiguiente matrimonio **no surge una sociedad legal de bienes gananciales** sobre la cual pueda recaer la responsabilidad económica por los alimentos de los hijos de uno de los cónyuges.[42]  Sobre el particular, en la doctrina española se ha expresado que en el régimen de separación de bienes ninguno de los hijos de uno sólo de los cónyuges está incluido dentro de las cargas del matrimonio, entendiendo que "es congruente con la economía de separación la aplicación pura y simple de los preceptos sobre alimentos entre ascendientes y descendientes **que no conocen ningún caso de deuda alimenticia entre parientes por afinidad**".  (Énfasis suplido.)  Jesús Delgado Echevarría, *El régimen matrimonial de separación de bienes en Cataluña*, Tecnos, 1974, pág. 177.

Algunos se han planteado si esto sucederá siempre o si debe dársele alguna consideración al hecho de si los hijos de uno de los cónyuges conviven o no en el hogar familiar.[43]  De acuerdo con Puig Ferriol y Roca Trías, los gastos de mantenimiento de los

---

[42]    El régimen de separación de bienes se produce cuando cada uno de los cónyuges tiene sus propios bienes, por lo que no existe ningún tipo de unión, confusión o comunidad.  "En la separación de bienes hay un patrimonio privativo del marido y otro privativo de la mujer, separados entre sí.  A cada cónyuge le pertenece la propiedad, el disfrute, la administración y la disposición de sus propios bienes".  Luis Díez-Picazo y Antonio Gullón, *Sistema de derecho civil*, Vol. IV, Tecnos, 7ma ed., 1997, pág. 231.  Véase además Jorge O. Azpiri, *Derecho de familia*, Hammurabi, 2000, pág. 141.

[43]    Nótese que, según el Art. 1362 del Código Civil español, "[l]a alimentación y educación de los hijos de uno solo de los cónyuges correrá a cargo de la sociedad de gananciales cuando convivan en el hogar familiar.  En caso contrario, los gastos derivados de estos conceptos serán sufragados por la sociedad de gananciales, pero darán lugar a reintegro en el momento de la liquidación".

hijos de uno de los cónyuges corren por cuenta de éste aunque convivan en compañía del matrimonio, de tal manera que si un cónyuge concurre con los gastos respecto a los hijos de otro, adquiere un crédito contra él. Puig Ferriol y Roca Trías, *Fundamentos del derecho civil en Cataluña, Derecho familiar Catalán*, Tomo II, Bosch, 1979, pág 125. Otros tratadistas opinan que el mantenimiento y educación de los hijos de uno sólo de los cónyuges que conviven en el hogar, aun mediando el régimen de separación de bienes, debe ser considerado una carga del matrimonio a la que ambos cónyuges están obligados a contribuir. Delgado Echevarría, *supra*, pág. 351. Sin embargo, se considera que "si los hijos no conviven en el hogar familiar, su sostenimiento y educación estará a cargo exclusivamente [d]el cónyuge progenitor". Ángel Luis Rebolledo Valera, *La separación de bienes en el matrimonio: El régimen convencional de separación*, Montecorvo, 1983, pág. 374.

Este tema también ha sido objeto de alguna discusión en Puerto Rico. Se ha señalado que una de las razones, posiblemente la principal, que tienen los futuros consortes para otorgar capitulaciones matrimoniales es, precisamente, que el nuevo cónyuge no responda por las deudas alimentarias del otro y que cláusulas en este sentido deben ser declaradas contrarias al orden público. Migdalia Fraticelli Torres, *Un nuevo acercamiento a los regímenes económicos en el matrimonio: La sociedad legal de gananciales en el derecho puertorriqueño*, 19 REV. JUR. U.I.P.R. 413, 434 y 500-501 (1995). Es necesario poner en perspectiva estas expresiones.

De entrada, debemos reconocer que nuestro ordenamiento permite al nuevo cónyuge que no desea ver comprometido su patrimonio con las deudas del otro cónyuge, inclusive las alimentarias, la alternativa de no contraer matrimonio bajo el régimen de sociedad legal de gananciales. En lo que aquí nos concierne, es decir, la responsabilidad del nuevo matrimonio casado bajo el régimen de separación de bienes por los alimentos que deba satisfacer uno de los cónyuges a favor de sus hijos menores que no conviven en el hogar del nuevo matrimonio, y a la luz de lo que hasta ahora hemos discutido, debemos concluir que la separación de bienes y el repudio a la sociedad de gananciales trae como consecuencia que la deuda de alimentos de uno de los cónyuges respecto a sus hijos se mantenga como una de carácter privativo y exclusivo de dicho padre o madre, **que éste debe satisfacer de su patrimonio.**

Lo anterior no es, de por sí, contrario al orden público, pues el ordenamiento impone la responsabilidad principal por los alimentos de los menores al padre y la madre y en cuanto a esta obligación el nuevo cónyuge es un tercero.[44] Si éste quiere asumir dicha obligación alimentaria, así puede hacerlo optando por el

---

[44] Es importante destacar que el derecho de alimentos en nuestro ordenamiento está fundamentado en relaciones de parentesco, por lo cual no se reconoce tal derecho entre terceros o parientes por afinidad. Cónsono con lo anterior, la obligación de alimentar se impone al **padre y madre** con respecto a sus hijos; los ascendientes y descendientes; los cónyuges **entre sí**; y los hermanos, y en este último caso sólo cuando el alimentista no pueda procurarse medios para su propia subsistencia por causas no imputables a éste. Debido a que no existe una obligación de alimentar entre terceros que no están unidos por vínculos de parentesco, no es contrario a la moral y al orden público el hecho que esa tercera persona no desee alimentar a otra con la cual no se tiene una relación familiar. Nada impide que se plasme tal voluntad en un contrato de capitulaciones matrimoniales.

régimen de la sociedad legal de gananciales, pero si ese no es su deseo, el ordenamiento permite separar su patrimonio del de su cónyuge alimentante.

Sin embargo, **como cuestión de política pública, no podemos perder de perspectiva que las deudas en concepto de alimentos tienen un carácter especial, en virtud de la protección debida a los menores y el deber de sus padres de proveerles alimentos con arreglo a su fortuna.** La declaración de política pública de la Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, Ley Orgánica de la Administración para el Sustento de Menores, 8 L.P.R.A. sec. 8, indica que:

> El incumplimiento de las obligaciones morales y legales por parte de uno o ambos padres para con sus hijos constituye uno de los problemas más apremiantes en nuestra sociedad. Causas de este problema lo son el deterioro de los valores sociales, la desintegración de la unidad familiar, el aumento en el número de niños nacidos fuera del matrimonio, el alto número de divorcios y el desempleo.
>
> **Ante el grave problema del incumplimiento de la obligación alimentaria hacia los hijos es necesario poner en vigor una política pública de paternidad responsable.** Además, es posible hacerlo porque, en la mayoría de los casos el padre incumplidor tiene la capacidad económica para satisfacer su obligación. (Énfasis suplido.)

En atención al alto interés publico del que está revestido el derecho de alimentos de los hijos menores de edad, la reclamación de un menor alimentista a los efectos de que su padre o madre que se ha casado bajo capitulaciones realmente no sigue el régimen de separación de bienes, debe ser analizada con mucha cautela. No se trata de que los futuros cónyuges no puedan pactar que sólo el padre o madre se hará cargo de la deuda alimentaria con respecto a

los hijos propios, sino de **evitar que el pacto de separación de bienes tenga realmente el único propósito de que el otro cónyuge evada una posible responsabilidad por alimentos**, mientras que en realidad los nuevos cónyuges, con respecto a todas sus demás deudas y la administración de todos sus bienes, se conduzcan realmente como una sociedad legal de gananciales, la cual, de ordinario, sí es responsable por los alimentos de los hijos de cualquiera de los cónyuges. Dentro de este contexto, debe reconocérsele al alimentista un derecho a inquirir sobre si los nuevos esposos siguen realmente el régimen de separación de bienes pactado.[45] **En tales casos el tribunal debe auscultar cuál es el régimen que realmente existe entre la pareja a los fines de asegurarse que las capitulaciones matrimoniales no son un subterfugio para que el padre o madre alimentante se libere en alguna proporción de su obligación alimentaria por el hecho de que las capitulaciones contengan pactos que tengan el propósito**

---

[45]    Por supuesto, quien ataca la validez de un contrato de capitulaciones matrimoniales y la realidad fáctica de los acuerdos allí establecidos tiene el peso de la prueba para convencer al juzgador de lo contrario. Para esto el alimentista tiene a su disposición los mecanismos de descubrimiento de prueba dispuestos en las Reglas de Procedimiento Civil. Por su parte, el alimentante casado bajo capitulaciones matrimoniales y su cónyuge, si lo estiman necesario, podrán oponerse a dicho descubrimiento si entienden que la información solicitada es privilegiada o la materia a descubrirse no es pertinente al asunto en controversia. Regla 23.1(a) de Procedimiento Civil, 23 L.P.R.A. Ap. III.· El alimentante también tendrá a su disposición el mecanismo de la orden protectora, en caso que el descubrimiento constituya "hostigamiento, perturbación u opresión, así como cualquier gasto o molestia indebida". Regla 23.2 de Procedimiento Civil, *supra*.· De igual forma, como el descubrimiento de prueba no es ilimitado, el tribunal podrá en casos como éstos, al igual que en cualquier litigio civil, limitar el alcance y los mecanismos de descubrimiento de prueba a utilizarse, siempre que con ello se adelante la solución de las controversias de forma rápida, justa y económica.

**<u>deliberado</u> o el <u>efecto</u> de reducir su capacidad para cumplir con la obligación alimentaria preexistente.**

Conviene indicar que una determinación a los efectos que existe realmente un régimen de separación de bienes y, por consiguiente, el cónyuge no alimentante no será responsable con su propio patrimonio por la deuda de alimentos del otro, no necesariamente excluye la posibilidad de que puedan tomarse en cuenta los ingresos de **ambos cónyuges** al determinar el monto de la pensión alimentaria a concederse en beneficio del hijo de uno de éstos.

Recuérdese que los padres tienen el deber de alimentar a sus hijos menores **con arreglo a su fortuna.** Podría darse el caso de que un padre o madre obligado a alimentar a un hijo contraiga nupcias bajo el régimen de separación de bienes, pero que, en virtud de dicho matrimonio, como cuestión de realidad, el alimentante se vea relevado de toda una serie de responsabilidades económicas por el hecho de que el otro cónyuge se haga cargo de éstas. En tales casos, el padre o madre obligado a prestar alimentos estaría obteniendo un beneficio o alivio económico sustancial y al hijo alimentista debe reconocérsele un derecho a participar de dichos beneficios. También podría ocurrir que, aunque exista la separación de bienes, el cónyuge alimentante sea el que tenga la responsabilidad económica mayor por las cargas del matrimonio, de manera que la distribución de las responsabilidades económicas resulte irrazonable y tenga el efecto de empobrecer el patrimonio del alimentante. En estos casos, los tribunales deberán evaluar cuidadosamente las alegaciones y la evidencia que

tenga ante sí de manera que se protejan adecuadamente los derechos del alimentista. Repetimos que lo esencial es asegurar que los acuerdos de la nueva pareja no tengan el efecto ni el propósito de reducir la capacidad del alimentante para cumplir su obligación de proveer alimentos a un hijo menor de edad habido en una relación anterior.

A la luz de lo expuesto anteriormente, corresponde que analicemos los hechos del caso de marras.

V

En su primer planteamiento, la recurrente alega que, como cuestión de derecho, la escritura de capitulaciones matrimoniales es nula en su forma y contenido, esencialmente porque ésta extiende la aplicación de sus cláusulas a la relación pre y post matrimonial del señor Cruz y la señora Arce; por contener cláusulas contradictorias entre sí; y por eximir expresamente a la señora Arce de la responsabilidad alimentaria por la menor aquí concernida. La señora Maldonado alega que es necesaria la celebración de una vista evidenciaria para resolver este particular.

No le asiste la razón. Aunque las capitulaciones matrimoniales son un contrato que está dirigido principalmente a regular el régimen económico matrimonial, ello no impide que se disponga en éstas para otro tipo de arreglos, que pueden incluir acuerdos pre matrimoniales y post divorcio. Se trata de asuntos que la pareja ha preferido consignar en la escritura de

capitulaciones.    Nada  hay  en  derecho  que  impida  tales  pactos,  siempre  que  no  sean  contrarios  a  las  leyes,  la  moral  o  el  orden  público.

Por  otra  parte,  las  cláusulas  G(10)  e  I  de  la  escritura  de  capitulaciones  matrimoniales,  en  las  que  se  establece  que  el  señor  Cruz  Dávila  será  el  único  responsable  por  la  deuda  alimentaria  de  su  hija  habida  con  la  señora  Maldonado,  tampoco  son  nulas  **de  su  faz**,  a  tenor  del  análisis  precedente  en  esta  Opinión.    No  obstante,  la  efectividad  de  aquella  parte  de  la  cláusula  I  en  la  cual  se  dispone  que  "bajo  ningún  concepto  podrán  tomarse  o  computarse  los  bienes  e  ingresos  de  la  [señora  Arce]  para  determinar  la  capacidad  de  pago  del  [señor  Cruz  Dávila]  en  cualquier  aportación  futura  que  venga  obligado  a  satisfacer  por  concepto  de  alimentos,  ya  sea  para  los  hijos  o  para  cualquier  ex  cónyuge"  estaría  sujeta  al  escrutinio  judicial  sobre  la  verdadera  relación  existente  entre  los  cónyuges.    Veamos.

La  señora  Maldonado  alegó  que  en  las  circunstancias  del  presente  caso,  era  necesaria  la  celebración  de  una  vista  evidenciaria  para  determinar  si  realmente  existe  entre  el  matrimonio  Cruz-Arce  el  régimen  de  separación  de  bienes  o  una  sociedad  legal  de  gananciales,  que  invalidaría  las  capitulaciones.  Para  justificar  la  necesidad  de  dicha  vista,  la  señora  Maldonado  hace  referencia  a:  (1)  las  planillas  de  información  económica  sometidas  por  el  señor  Cruz  Dávila  y  la  señora  Arce  a  principios  de  1997  y  (2)  las  cláusulas  de  la  escritura  donde  se  consignan  las  aportaciones  que  hará  uno  y  otro  cónyuge  al  hogar  familiar.    De  las  planillas  de  información  económica  rendidas  por  el  señor  Cruz

Dávila y la señora Arce surge que éste tenía unos gastos médicos y de otra índole que eran similares a los reportados por la señora Arce en su correspondiente planilla.[46]  Por su parte, la señora Arce indicó en su planilla que era estudiante y la totalidad de sus gastos eran sufragados por su esposo.

Según la señora Maldonado, la coincidencia en los gastos de uno y otro cónyuge y el hecho de que el señor Cruz Dávila, al menos durante 1996, aparentemente pagó los gastos de su esposa por ésta ser estudiante, sugiere la existencia de una sociedad legal de gananciales o, al menos, una comunidad de bienes.

Para atender este planteamiento es necesario indicar que el hecho de que una pareja casada bajo separación de bienes reporte unos gastos similares, no significa que no siguen la separación de bienes.  Más bien, refleja que ambos tienen un nivel de vida y gastos similares, lo cual no es extraño en la vida en pareja.  Por otra parte, en el caso específico de los esposos Cruz-Arce, el hecho de que durante el año 1996 aparentemente el señor Cruz Dávila cubría los gastos de su esposa, tampoco tiene la consecuencia de convertir su matrimonio en una sociedad de gananciales.  De hecho, los esposos Cruz-Arce contemplaron la posibilidad de que en algún momento uno de ellos tuviese que hacerse cargo de los gastos del otro.  A estos efectos

---

[46]  Por ejemplo, el señor Cruz Dávila indicó que sus gastos de laboratorios eran aproximadamente diez dólares ($10.00) mensuales, mientras que su esposa reportó gastos en el mismo concepto de veinte dólares ($20.00) mensuales.  En deducibles médicos ambos reportaron un gasto de diez dólares ($10.00) mensuales.  En medicinas el señor Cruz Dávila y la señora Arce reportaron veintinueve ($29.00) y cuarenta ($40.00) dólares, respectivamente. En gastos de entretenimiento cada uno reportó doscientos dólares ($200.00).

estipularon, en la cláusula H de la escritura, que "únicamente mientras dure su matrimonio, y en la eventualidad de que uno de ellos se enferme de cama o quede temporeramente incapacitado u imposibilitado de generar suficientes ingresos para satisfacer su aportación al hogar conyugal, el otro asumirá esa responsabilidad hasta tanto cese el impedimento o incapacidad del primero".

Como se puede notar, aunque no se menciona específicamente el asumir los gastos de un cónyuge mientras el otro esté estudiando, la cláusula citada puede razonablemente aplicarse a esta situación ya que todo parece indicar que los estudios de la señora Arce imposibilitaban, al menos para 1996, que ésta hiciera mayores aportaciones al hogar conyugal.  Dicha asunción de gastos por parte del señor Cruz Dávila, que pudo haber sido temporal, no significa de por sí, que los esposos Cruz-Arce incumplen el régimen económico pactado.

Sin embargo, la recurrida señala que de acuerdo a la escritura de capitulaciones, la señora Arce hará aportaciones al hogar familiar, por lo que "al alimentante habrá de imputársele un ahorro en sus gastos propios".  Por otra parte, también alega que "en la medida en que el alimentante aporta al sostenimiento del hogar conyugal, según la escritura aludida, se está empobreciendo su patrimonio disponible....  [y que l]a medida y alcance de la imputación de ingresos aquí planteada es pertinente a la investigación de la situación económica".

Al analizar la escritura de capitulaciones, encontramos que ésta efectivamente establece las cargas del hogar de las cuales se hará cargo uno y otro cónyuge con sus respectivos ingresos.  Por

ejemplo, en la cláusula F se indica que la señora Arce se hará cargo de la compra de comestibles y alimentos, los cargos de electricidad, agua, teléfono y cable y los gastos de jardinería y reparaciones del hogar, mientras que el señor Cruz Dávila se hará cargo de los gastos personales y de ropa de ambos cónyuges, hipoteca, renta, mensualidad de la casa en que ambos residan, así como reparaciones y mejoras a la misma, además de los gastos de entretenimiento y viaje, entre otros extremos.

Consideramos, en principio, que este tipo de acuerdos son parte de la vida en común de la pareja que reflejan la manera en que ésta ha decidido organizarse económicamente. Por tanto, no se puede deducir de éstos, sin más, que los esposos Cruz-Arce no han seguido el régimen económico de separación de bienes. Se trata simplemente de una consignación en la escritura de las deudas y cargas del hogar por las cuales será responsable cada uno de los cónyuges.

No obstante, la particular división de las cargas económicas del matrimonio Cruz-Arce sugiere que podría ser el señor Cruz Dávila quien ha asumido la mayor parte de los gastos del matrimonio y del hogar o, al menos, los de mayor envergadura. En estas circunstancias, entendemos que el tribunal no tuvo ante sí toda la verdad para poder adjudicar con la totalidad de los elementos la reclamación relativa a la imputación de ingresos, máxime cuando el señor Cruz Dávila se ha opuesto al aumento de pensión solicitado. Por lo anterior, ni el foro primario ni el apelativo contaron con todos los elementos para determinar si los acuerdos de la pareja han tenido el efecto o el propósito de

menoscabar la capacidad económica del señor Cruz Dávila, en alguna medida, para cumplir su obligación alimentaria.  De ser tal la situación, las capitulaciones no podrían ser validadas.

En atención a las anteriores circunstancias, era improcedente resolver sumariamente el presente caso.  Por el contrario, debía permitírsele a la alimentista auscultar la distribución de responsabilidades económicas del matrimonio y el efecto de ésta, si alguno, sobre el patrimonio a disposición del padre alimentante para atender las necesidades de ésta.  Al adjudicar un reclamo de alimentos de un hijo menor de edad los tribunales no podemos aplicar fórmulas aritméticas de forma automática o preceptos estatutarios sin indagar responsablemente sobre el posible menoscabo del derecho de alimentos que cobija a dicho menor. Validar automáticamente tales capitulaciones constituiría, además, una actuación en abierta contravención a la política pública que existe en nuestro país de asegurar que los padres y madres alimentistas cumplan con este deber responsablemente.  No podemos suscribir el curso de acción seguido por la mayoría de aplicar unos preceptos legales de forma técnica, de espaldas al hecho que posiblemente la verdadera relación económica del nuevo matrimonio podría afectar en la práctica al alimentante para cumplir su obligación.

En vista de los fundamentos antes expuestos, revocaríamos y devolveríamos el caso al foro de instancia para que celebre una vista evidenciaria sobre este particular con la intervención de la señora Arce como parte indispensable.

MIRIAM NAVEIRA MERLY<br>
Jueza Presidenta